## MARK A. SHUCK *v.* STATE OF MARYLAND

[No. 226, September Term, 1975.]

*Decided November 26, 1975.*

34

The cause was argued before MOYLAN, POWERS and LOWE, JJ.

*Selig Solomon, Assigned Public Defender,* with whom were *Alan W. Bernstein* and *Goldstein, Solomon & Bernstein* on the brief, for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Warren B. Duckett, Jr., State's Attorney for Anne Arundel County,* and *Gerald Anders, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Mark A. Shuck, was convicted in the Circuit Court for Anne Arundel County by a jury, presided over by Judge Matthew S. Evans, of both murder in the second degree and assault with intent to murder. Upon this appeal, he raises four contentions:

1) That the evidence was not legally sufficient to submit the charge of second-degree murder to the jury;

2) That the evidence was not legally sufficient to submit the charge of assault with intent to murder to the jury;

3) That an erroneous jury instruction was given on the use of a deadly weapon; and

4) That a jury instruction to the effect that malice may be presumed and that the burden was upon the appellant to show such mitigation as would reduce the crime to manslaughter denied him due process under *Mullaney v. Wilbur*, 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975), and *In re Winship*, 397 U. S. 358, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970).

With respect to the appellant's first contention, the evidence was legally sufficient to sustain the verdict of murder in the second degree. There was ample evidence from which the jury could have concluded that when the appellant struck and killed one Buddy Voelker with a baseball bat, he did so with either an intent to kill or an intent to do grievous bodily harm, he did so without legal justification or excuse and he did so without any circumstance of mitigation. Similarly, with respect to the appellant's second contention, the evidence was legally sufficient to sustain the verdict of assault with intent to murder George Parker, under circumstances where the appellant also hit Parker with the same baseball bat. The factual versions of what occurred in the confused and angry medley that took place on the morning of June 29, 1974, varied significantly in terms of who was the aggressor at various stages of the fight, who entered into the fight mutually and wilfully and who was simply defending in an effort to extricate himself from a difficult situation. In judging the legal sufficiency of the evidence, we have taken that version of the facts most favorable to the State. In dealing hereinafter with the appellant's fourth contention, however, we must reverse the slant and take the version of the facts most favorable to the appellant.

Before moving on to that fourth contention, however, we will point out that with respect to the third contention — the allegedly erroneous instruction on the use of a deadly weapon — that no objection was made below and the point is not preserved for appellate review. Maryland Rule 756g. The point is, moreover, rendered moot by out judgment that the convictions must, in any event, be reversed because of the fourth contention, to which we now turn our consideration.

The court gave the following instruction:

"The law presumes that in the absence of justification or excuse or some other circumstances of mitigation all homicides are committed with malice and thereby constitute murder in the second degree. In other words, the presumption of homicide is that it is murder in the second degree and that the State must prove or have the burden of proving that the murder was actually murder in the first degree, and once the State has proved an unlawful homicide to have been committed by the accused, however, the burden rests upon the defendant not to satisfy you beyond a reasonable doubt but to a fair preponderance of the evidence that the killing happened under circumstances to reduce the homicide to manslaughter."

We note initially that *Mullaney v. Wilbur* applies in this case to the instruction on assault with intent to murder just as surely as it applies to the instruction dealing with the murder charge itself. Since a necessary element of assault with intent to murder is the malicious state of mind such as would constitute murder if the assault victim had died, an instruction on the elements of murder, on the relevant defenses to murder and on the burdens with respect thereto was called for. Under a fair reading of the broad principle enunciated in *Mullaney v. Wilbur* (see Part IIB of *Evans v. State*, 28 Md. App. 640, 349 A. 2d 300), a constitutional allocation of the burden of persuasion in an assault with intent to murder case is mandated just as surely as is a constitutional allocation of the burden of persuasion in a felonious homicide case.

There can be no doubt but that the jury instruction in this case, presuming malice and placing the burden upon the appellant to prove by a fair preponderance of the evidence that the killing was accompanied by such mitigating circumstances as would reduce the crime to manslaughter, was unconstitutional under *Mullaney v. Wilbur. Evans v. State*, Part IIG. In the assault with intent to murder case,

moreover, an improper instruction on the burden of proof with respect to mitigation might well mark the difference not simply between one degree of felonious homicide (second-degree murder) and another (manslaughter) but between guilt and total exculpation. As we further analyzed in Part IF and Part IIH of *Evans v. State,* however, an erroneous allocation of the burden of proof with respect to a particular defense will be deemed immaterial unless the evidence has generated a genuine jury issue with respect to that defense.

We now turn our attention, therefore, to the question of whether any issue of justification, excuse or mitigation was generated by the evidence. The lethal attack upon Voelker and the non-lethal attack upon Parker were so essentially contemporaneous and inseparable in terms of purpose that both convictions will stand or fall together as we proceed with our analysis.

We note initially, even taking that version of the facts most favorable to the appellant, that the evidence did not generate a genuine jury issue with respect to such self-defense as might totally justify or excuse the appellant's actions. Even granting that the appellant and his companion were mere victims rather than mutual combatants, the brawl or scuffle which was taking place was non-deadly in character. All four persons involved were in some state of inebriation. There had been angry words. The appellant and his companion were good-sized and healthy men who were by no means outclassed physically. There had been several blows struck with fists and the appellant's companion had been wrestled to the ground. It was at this point that the appellant himself escalated the combat to the deadly level by going to his companion's automobile, taking out a baseball bat and introducing that weapon into the fray. Even granting for the moment all other aspects of self-defense, the law is clear that "Deadly force is not privileged in defense against non-deadly force." Perkins, *Criminal Law* (2d Ed., 1969), p. 996. LaFave and Scott, *Criminal Law* (1972), makes the same point, at pp. 392-393:

"The law of self-defense (and of defense of

others) makes a distinction between 'deadly' force and 'nondeadly' (or 'moderate') force, holding that there are situations wherein it is reasonable to use nondeadly force but not to use deadly force. . . .

In determining how much force one may use in self-defense, the law recognizes that the amount of force which he may justifiably use must be reasonably related to the threatened harm which he seeks to avoid. One may justifiably use *nondeadly* force against another in self-defense if he reasonably believes that the other is about to inflict unlawful bodily harm (it need not be death or serious bodily harm) upon him (and also believes that it is necessary to use such force to prevent it). That is, under such circumstances he is not guilty of assault (if he merely threatens to use the nondeadly force or if he aims that force at the other but misses) or battery (if he injures the other by use of that force). He may justifiably use *deadly* force against the other in self-defense, however, only if he reasonably believes that the other is about to inflict unlawful death or serious bodily harm upon him (and also that it is necessary to use deadly force to prevent it)."

It may be said as a matter of law that no issue of justification or excuse was generated by the evidence in this case. Such is not the situation, however, with the issue of mitigation. Again taking that version of the facts most favorable to the appellant, the evidence did fairly generate the issue of mitigation in two separate forms.

### *Hot-Blooded Response to the Provocation of Mutual Combat*

From the evidence, the jury could fairly deduce the following picture. The appellant and his companion, John Jackman, were two young men and co-workers who had been visiting a bar and a party and consuming a number of beers from the early evening of June 28 through approximately

midnight. At shortly after midnight, Jackman was driving his Corvette sports car. The appellant was a passenger in the car and they were both returning to a bar to pick up the appellant's girlfriend, who worked there. As they stopped for a light, a GTO sports car pulled up beside them. When the light turned green, the GTO pulled off suddenly, spinning its wheels and throwing up gravel. Interpreting this as an invitation to a race, Jackman and the appellant took off in pursuit. It was at that point that George Parker, a 48-year-old man, was returning home in his pickup truck from his own evening of drinking at his own bar. The pickup truck pulled onto the highway and ended up between the GTO and the pursuing Corvette. The GTO pulled onto a side road. The Corvette, occupied by the appellant and his companion, pulled off after it, cutting off in the process but not hitting the pickup truck driven by Parker. In slamming on his brakes, Parker hit his head on his own windshield and became angry. Rather than let the matter rest, Parker then took off in pursuit.

The GTO soon pulled to a stop in a small court with a single entrance. Its occupant, the ultimate homicide victim, Buddy Voelker, alighted. The appellant and his companion, who were strangers to Voelker, pulled to a stop behind the GTO. Apparently because of their shared common interest in automobiles, Voelker and Jackman began a friendly conversation. At that moment, Parker arrived in his pickup truck, still red with anger. He parked his truck across the entrance to the court so as to block any vehicular exit therefrom. He approached the Corvette, in which the appellant and Jackman were still seated. (Voelker had walked up to the window and was carrying on the conversation from that vantage point.) Parker ordered Jackman out of the car. He shouted several obscenities. According to the appellant, Parker reached into the car and hit Jackman at least once in the face with his fist. After repeatedly being challenged by Parker in angry words, Jackman got out of his own vehicle. At one point, apparently, Jackman and the appellant attempted to get back in Jackman's car and leave the area. Parker, with

Voelker trying to restrain him, shouted several obscenities at them and they stopped the car and got out. According to the appellant, at one point Parker and Jackman were struggling with each other when Voelker leaped onto both of them, knocking everyone to the ground in the process. The appellant testified that he attempted to pull Voelker from the pile. At that point, Voelker turned to the appellant and ultimately was on his back, gripping him about the shoulders. The appellant stated that Voelker hit him several times. At this point, the appellant ran and got the bat from his companion's automobile and swung at least twice. One blow hit Parker, injuring him slightly. The other hit Voelker in the head and ultimately resulted in his death.

At Voelker's autopsy, the blood alcohol level was revealed to be 0.14%. A girlfriend of Jackman's, Terri Jones, testified that when she saw Jackman shortly after the incident, he was bleeding from the mouth and nose and had strangulation marks on his neck.

Upon this evidence, the issue of mitigation by way of a hot-blooded response to mutual combat was fairly generated in the case. *Whitehead v. State*, 9 Md. App. 7, 262 A. 2d 316. Perkins, *op. cit.*, at 57-59; LaFave and Scott, *op. cit.*, at pp. 574-575.

### Mitigation by Way of "Imperfect" Self-Defense

Although by far the most common form of mitigation is that of a hot-blooded response to legally adequate provocation, this is not the only form of mitigation that will negate malice and will reduce what might otherwise be murder to manslaughter. It was of this very possibility that we spoke in *Evans v. State*, Part IC, at n. 4:

> "This analysis presupposes that the type of mitigation fairly in issue is of the common and orthodox 'hot blood in response to legally adequate provocation' variety. The foreclosing effect of a first-degree murder conviction would not, however, apply in those very rare cases where manslaughter is predicated upon the far more esoteric ex-

tenuating circumstances, 'not yet far advanced,' of 'an "imperfect" right of self-defense or defense of others, or of crime-prevention, or of the defenses of coercion or necessity, in which the killing, though not justifiable, is not bad enough to be murder.' LaFave and Scott, *Criminal Law* (1972), § 77, 'Other-Extenuating-Circumstances Voluntary Manslaughter,' pp. 583-586. This qualification, it should be noted, is little more than an academic possibility." (It is now more than academic.)

Perkins, *op. cit.*, at 69-70, described this legal phenomenon of "Mitigation Other Than Provocation":

"Since manslaughter is a 'catch-all' concept, covering all homicides which are neither murder nor innocent, it logically includes some killings involving other types of mitigation, and such is the rule of the common law. For example, if one man kills another intentionally, under circumstances beyond the scope of innocent homicide, the facts may come so close to justification or excuse that the killing will be classed as voluntary manslaughter rather than murder. 'It is not always necessary to show that the killing was done in the heat of passion, to reduce the crime to manslaughter;' said the Arkansas court, 'for, where the killing was done because the slayer believes that he is in great danger, but the facts do not warrant such a belief, it may be murder or manslaughter according to the circumstances, even though there be no passion.' To give another illustration, the intentional taking of human life to prevent crime may fall a little short of complete justification or excuse and still be without malice aforethought."

One of these other forms of mitigation is "imperfect" self-defense. Looking at the facts in a light most favorable to the appellant, his companion was neither an aggressor nor a mutual combatant. He was under unprovoked attack from at least one and possibly two persons. Under the

circumstances, the appellant was entitled to intervene in defense of his friend. In this regard, see Perkins, *op. cit.*, at p. 1020:

> "If two are engaged unlawfully in a mutual fight (deadly or nondeadly) the law does not authorize anyone (close relative or stranger) to take sides in the contest and aid one in the effort to overcome his adversary, but the problem is quite different if the fight is not mutual. If one is using only privileged force in the effort to defend himself against an unlawful attack anyone is authorized to go to his defense and use force (subject to the familiar limitations) in the effort to save him from the threatened crime . . ."

And see LaFave and Scott, *op.cit.*, at pp. 397-398:

> "[M]any American statutes still on the books purport to limit the use of force in defense of others to the defense of those who bear some designated relationship to the defender. Yet the modern and better rule is that there need be no such relationship, so that one is entitled in an appropriate case to use force to protect a friend or acquaintance or even a stranger from threatened harm by a third person.

And cf. *Tipton v. State*, 1 Md. App. 556, 232 A. 2d 289, and *Guerriero v. State*, 213 Md. 545, 549, 132 A. 2d 466:

> "A third person, closely related to or associated with one attacked in such a manner that he could properly have defended himself by the use of force, has a right to go to the defense of the person attacked and to use the same degree and character of force that the one attacked could have used."

Even if the appellant's belief that he had a right to intervene in defense of his companion was erroneous,

however,[1] and even granting further the unreasonableness of his excessive escalation to the deadly level of what had been a non-deadly combat, he had nonetheless generated the issue that even this "imperfect" right of self-defense might mitigate his guilt for the felonious homicide to the manslaughter level and might, thereby, totally exculpate him on the assault with intent to murder charge. With respect to this less common form of mitigation, we are highly persuaded by LaFave and Scott, *op. cit.*, at 583-584:

> "In order for a killer to have a 'perfect' defense of self-defense to homicide, (1) he must be free from fault in bringing on the difficulty with his adversary; and (2) he must reasonably believe (though he need not correctly believe) both (a) that his adversary will, unless forcibly prevented, immediately inflict upon him a fatal or serious bodily injury, and (b) that he must use deadly force upon the adversary to prevent him from inflicting such an injury. If one who is not the aggressor kills his adversary with these two actual and reasonable beliefs in his mind, his homicide is justified, and he is guilty of no crime — not murder, not manslaughter, but no crime.
>
> What if a defendant who did not initiate the difficulty honestly but unreasonably believes either that he is in danger of the injury or that killing is the only way to prevent it; or, even though he reasonably believes these things, he was at fault in bringing about the difficulty? He cannot have the defense of self-defense, for that requires both freedom from fault in the inception of the difficulty and the entertainment of beliefs which are

---

1. In this regard, however, see Article 27, Section 12A:

"Any person witnessing a violent assault upon the person of another may lawfully aid the person being assaulted by assisting in that person's defense. The force exerted upon the attacker or attackers by the person witnessing the assault may be that degree of force which the assaulted person is allowed to assert in defending himself."

reasonable. But is murder the only alternative? Or should the matter fall into the category of manslaughter, consisting of those homicides which lie in between murder and no crime. Some cases so hold, whether the reason for the 'imperfection' of the defense is the defendant's own fault in bringing on the difficulty or the unreasonableness of the honest but erroneous beliefs which he entertains. On principle, the same rule should apply to a killing done in the case of a homicide under an 'imperfect' right to defend others, as applies in the case of the homicide under an 'imperfect' right of self-defense. The manslaughter provisions of two of the latest comprehensive criminal codes — those of Illinois and Wisconsin — recognize the existence of this imperfect-right-of-self-defense or defense-of-others type of voluntary manslaughter."

Under the circumstance, *Mullaney v. Wilbur* will apply and the convictions must be reversed.

*Judgments reversed; case remanded for a new trial.*