519 A.2d 1340

**William Lee LAMBERT**

v.

**STATE of Maryland.**

**No. 691, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Jan. 20, 1987.

Certiorari Denied June 4, 1987.

84

Scott E. Blitz (Lester V. Jones, P.A., on brief), Bel Air, for appellant.

Valerie W. Loftin, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Joseph I. Cassilly, State's Atty. for Harford County and William G. Christoforo, Bel Air, on brief), for appellee.

Argued before MOYLAN, BLOOM, and ROBERT M. BELL, JJ.

BLOOM, Judge.

A jury in the Circuit Court for Harford County, presided over by Judge Albert P. Close, convicted appellant, William Lee Lambert, of assault and battery, assault with intent to murder, carrying a weapon openly with intent to injure another, and attempt to commit murder. Appellant was sentenced to prison terms of three years for the assault and battery, twenty years for assault with intent to murder, and three years for the weapons offense. For the attempted murder conviction he received a sentence of life imprisonment, with all but twenty years suspended. All sentences were concurrent.

The issues in this appeal are as follows:
1. Whether the trial judge erred in refusing to instruct the jury on the doctrine of self-defense;
2. Whether the trial judge erred in failing to instruct the jury on the doctrine of imperfect self-defense.

For the reasons set forth below, we answer both questions in the negative and, therefore, affirm the convictions.

## Facts

All of the charges against appellant stem from the stabbing of Thomas Malone on 14 April 1985. Malone was stabbed with a knife some 26 times in the face, arms, chest, abdominal region and right flank.

The victim and some of his friends, Kevin Kahoe, Charles Offney and Michael Snyder, left a party which appellant and his friends, Mark Rodano, Jeffrey Hoffman and Glen Nealy, had also attended. Appellant's version of the incident, as testified to at trial, is as follows. A car in which the victim was riding pulled up to the place where appellant and his companions were standing and someone "yelled something" at the victim's group. Kevin Kahoe and the victim asked appellant and his group if they "had a problem." Appellant replied in the negative. The car then pulled away. Shortly thereafter, however, the victim and several others ("four or more") returned and approached appellant's group. The victim and appellant's friend Rodano had a verbal confrontation, but appellant testified it was peaceably terminated.

The events subsequent to the termination of the verbal confrontation between the victim and Rodano were described by appellant, on direct examination, as follows:

[APPELLANT]: I felt as if Tom Malone was getting pretty uptight. He was playing with his hands and everything. I didn't know what he was doing. He was just upset. And I felt like things were getting pretty boring. So I said, "if you guys are going to end it, let's end this." And I took off my jacket and laid it on the car.

[COUNSEL FOR APPELLANT]: What happened then?

A. At that time Tom Malone made a remark to me.

Q. What did he say to you?

A. I can't remember what the remark was.

Q. Who advanced to whom, if anyone?

A. I turned around and faced Thomas Malone and we faced each other.

Q. And then what happened?

A. I remember falling against the car.

Q. How did you fall against the car?

A. Thomas and I made contact with each other. I was knocked back.

Q. When you hit the car, did you hit anything?

A. I remember my body hitting the door side of the car, and I fell to the ground, hitting my head and everything.

Q. You hit your head on what?

A. Against the body of the car.

Q. What happened next?

A. I just remember as I was starting to get up, Tom came at me and we started confronting each other.

Q. What happened then?

A. We were swinging. I just remember getting hit. We were swinging. Fighting. I can't picture anybody that was around me. I felt really light-headed.

Appellant recalled fighting with the victim and being hit in the head from behind by someone other than the victim. He also remembered having a knife with him on the night in question, to open beer cans. He testified, however, that he could not recall using the knife on the victim or throwing it away in an effort to conceal it. He attributed his inability to recall using the knife to his hitting the car when the victim pushed him, to the blow he received on the head, and to his intoxication. On cross-examination, appellant proffered that he had not taken off the jacket because he was "bored" but because "I know for a fact when you do drink you get very hot. And I had a thick wool sweater on that night."

Several pre-trial statements that appellant had made to the police were admitted into evidence. A police officer, Sergeant Walter G. Shultz, testified to their content. In appellant's first statement, made to Sgt. Shultz on the scene immediately after the incident, he denied stabbing the victim and claimed he never carried a knife. He made no statement respecting how the fight was initiated or his state of mind during the fight.

In appellant's second statement, made in the early morning hours after the incident, he said he noticed the victim "putting on a ring or something on his right hand" after the disagreement between the victim and Rodano. Appellant then said to the victim, "What are you, a tough guy?" and the victim replied affirmatively. The two had "words" and the victim "punched [appellant] with his right hand on the left side of [his] head." Then somebody hit him in the back of the head and dazed him. Appellant remembered punching the victim, but said it was in "self-defense." He denied owning a knife and could not recall stabbing the victim.

In his third statement to the police on August 1, 1986, appellant admitted having a knife with him on the night in question to "torpedo" (open) beer cans. He stated the victim and about six persons walked toward him and his group as if they wanted to fight. The victim, according to appellant, was acting belligerently and challenging Rodano. When it was apparent Rodano would not fight, the victim badgered appellant and then charged toward appellant and knocked him on the ground. Appellant admittedly went into a rage and started punching the victim while the knife was in his hand. He claimed he did not realize what he had done until after the fight was over and then he became scared and threw the knife into the yard. On cross-examination, Sgt. Shultz was asked whether appellant then told him he was scared of the crowd. The sergeant replied, "he may have made that statement. I don't have it anywhere in my notes to indicate that."

Mark Rodano, one of appellant's group, admitted he and the victim had resolved their differences when appellant threw his jacket off and set it on the car. He testified the victim then said, "that's right, you better take off your jacket." At that point, appellant and the victim "just met ... coming right at each other." He also said "they both hit and it's just like they went back against the car and went down to the ground." The fight looked "pretty even" to Rodano. He saw the victim's friend Charles Offney hit appellant once in the head and then Offney "just stopped."

He said appellant did not appear dazed. Although Rodano did not see the knife during the struggle, he had seen it earlier at the party, and he saw appellant throw his hands up after the fight and what appeared to be "a flash of something that must have been the knife."

Jeffrey Hoffman, another of appellant's friends, admitted the victim and his companions were not intimidating appellant and his group. He could not recall who initiated the struggle between appellant and the victim and said, "they just came together at the same time, and I saw Bill [appellant] fall back" against the car. Appellant then "caught himself and started punching." He remembered Offney trying to intervene and hitting the victim and "everyone just said let him go, let them get it out of their system...." He said the fight was "fairly even" and "no one was slacking off" or yielding. Hoffman did not see the knife being used during the altercation although appellant had shown him the knife earlier, outside the party.

In his testimony at trial, the victim portrayed appellant as the initial aggressor. The testimony of Charles Offney and Michael Snyder essentially corroborated the victim's testimony. Offney testified that during the fight appellant and the victim were "in a huddle position. They almost had their heads together, their upper shoulders together." He added that after he saw the victim fall, and then stand up, he wondered why the victim was weak. He saw appellant thrust a long sharp object into the victim several times and then Offney struck appellant on the right side of his face with his fist to get appellant away from the victim. Appellant then stabbed Offney in his left hand. Offney yelled, "he's fighting with a knife," at which point appellant raised his hands and threw the knife behind him. Appellant then said, "I'm not using a knife. I'm using my hands."

Snyder also corroborated Offney's testimony respecting the latter's efforts to get appellant off the victim. He also testified that after Offney hit appellant, "that's when everything stopped." While he did not see the knife during the

fight, he heard Offney yell that appellant had a knife. He then saw appellant step back and throw his hands up.

Corporal James Reinhart, an officer of the Maryland State Police, who lived in the immediate vicinity, was awakened by screaming and shouting in the street. He testified the victim and appellant "were like two bulls. They had their heads together and their bodies were humped over." In response to a question as to which of the two combatants was the aggressor, he testified he saw appellant "pushing the other person [the victim] backwards." Reinhart pulled the boys apart. The officer estimated that a crowd of about 30 persons had gathered during the fight. When asked whether, in view of the size of the crowd, he was "beginning to fear a little bit for [his] own safety ...," Reinhart replied affirmatively. Nevertheless he also stated, "It was two people fighting and the other people were not involved in the fight...."

Appellant, who is 5'11" tall, weighed 185 pounds, was on the varsity wrestling and football teams at his high school and won several Harford County wrestling titles. The victim's height was 5'9½" and he weighed 170 pounds at the time of the incident.

## I

Appellant's first contention is that the trial court erred in refusing to instruct the jury on the doctrine of self-defense.

It is incumbent upon the trial court, when requested in a criminal case, to give an instruction to the jury on every essential question or point of law supported by the evidence. *Smith v. State*, 302 Md. 175, 179, 486 A.2d 196 (1985); *Dillon v. State*, 277 Md. 571, 584–85, 357 A.2d 360 (1976); *England and Edwards v. State*, 274 Md. 264, 275–76, 334 A.2d 98 (1975); *Bruce v. State*, 218 Md. 87, 97, 145 A.2d 428 (1958); *see also* Rule 4–325(c), Md.Rules of Procedure. To generate the issue of self-defense the accused must produce evidence establishing a *prima facie* case of self-defense. *Cunningham v. State*, 58 Md.App.

249, 255, 473 A.2d 40 (1984); *Street v. State*, 26 Md.App. 336, 338–39, 338 A.2d 72, *cert. denied*, 275 Md. 756 (1975). The record below must demonstrate that:

(1) The accused ... had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

(2) The accused must have in fact believed himself in this danger;

(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

(4) The force used must not have been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*State v. Faulkner*, 301 Md. 482, 485–86, 483 A.2d 759 (1984). *See also Tichnell v. State*, 287 Md. 695, 718, 415 A.2d 830 (1980); *DeVaughn v. State*, 232 Md. 447, 453, 194 A.2d 109 (1963), *cert. denied*, 376 U.S. 927, 84 S.Ct. 693, 11 L.Ed.2d 623 (1964); *Guerriero v. State*, 213 Md. 545, 549, 132 A.2d 466 (1957). It should be noted, additionally, that it is the duty of the defendant, when defending himself outside the home, to retreat or avoid the danger if the means to do so are within his power and consistent with his safety. Where, however, the peril is so imminent that he cannot retreat safely, he has a right to stand his ground and defend himself. *DeVaughn, supra*, 232 Md. at 453, 194 A.2d 109; *Bruce, supra*, 218 Md. at 97, 145 A.2d 428.

Even when the evidence is viewed in the light most favorable to appellant, *Jacobs v. State*, 32 Md.App. 509, 510, 363 A.2d 257 (1976), it does not make out a *prima facie* case of self-defense.

■ Appellant used deadly force against the victim. The law is clear that a person may defend himself even to the extent of taking life to repel the attack of an aggressor when he *reasonably* and *actually* believes both (1) that the other is about to inflict death or serious bodily injury upon

him and (2) that it is necessary to use deadly force to prevent it. *Shuck v. State,* 29 Md.App. 33, 38, 349 A.2d 378 (1975). *See also Guerriero, supra,* 213 Md. at 549, 132 A.2d 466; *Ware v. State,* 3 Md.App. 62, 65, 237 A.2d 526 (1968); *Tipton v. State,* 1 Md.App. 556, 562, 232 A.2d 289, *cert. denied,* 247 Md. 742 (1967). One is not privileged to use deadly force in defending oneself against non-deadly force. *Shuck, supra,* 29 Md.App. at 37, 349 A.2d 378. It has been said that the rule generally "precludes the use of a deadly weapon against an unarmed assailant." W. La-Fave & A. Scott, *Criminal Law,* at 456–57 (2d ed. 1986). This is not inevitably the case for "account must be taken of the respective sizes and sex of the assailant and defendant, of the presence of multiple assailants, and of the especially violent nature of the unarmed attack. Past violent conduct of the assailant known by the defendant is also relevant in assessing what the defendant reasonably believed was the quantum of risk to him." *Id.* at 457. *See also Wharton's Criminal Law,* at 318–19 (C.E. Torcia 14th ed. 1979).

■ Appellant contends that the following evidence indicates appellant had reasonable grounds for believing he was in imminent peril of death or serious bodily injury and needed to use deadly force to prevent the harm: (1) at the outset of the struggle, appellant was pushed back forcefully against a car by the victim; (2) the victim never backed down from the fight and the match was fairly even in nature; (3) appellant was struck in the head by Charles Offney, a member of the victim's group; and (4) the police officer's affirmative response to the question whether he "feared a little bit for [his] safety" because of the size of the crowd gathered.

With respect to the first blow struck by the victim, we note that under similar circumstances we have upheld the finding of a trial judge that the defense of self-defense was unavailable. *Ware, supra,* 3 Md.App. at 64–65, 237 A.2d 526 (appellant not entitled to acquittal on basis of self-de-

fense although he was hit with such force that he fell to the floor immediately prior to stabbing the deceased).

In *Shuck, supra,* we held that the evidence did not generate the issue of self-defense where the appellant used deadly force in circumstances similar to those involved here. We noted:

Even granting that the appellant and his companion were mere victims ... the brawl or scuffle which was taking place was non-deadly in character.... The appellant and his companion were good-sized and healthy men who were by no means outclassed physically. There had been several blows struck with fists and the appellant's companion had been wrestled to the ground. It was at this point that the appellant himself escalated the combat to the deadly level by ... taking out a baseball bat and introducing that weapon into the fray.

29 Md.App. at 37, 349 A.2d 378. The use of deadly force against non-deadly force in these circumstances precluded an instruction on self-defense.

While the first blow struck by the victim may have afforded a reasonable basis for a conclusion that the victim intended to inflict *some* harm, it did not provide a reasonable basis for the belief he intended to inflict serious bodily harm or death or that deadly force was needed to prevent such harm. As in *Shuck,* appellant was by no means outclassed physically by the victim. He was both taller and heavier than the victim and acknowledged at trial that he was a champion wrestler.

The testimony as to the fairly even nature of the match would tend to support the conclusion that deadly force was not needed to repel the attack. While the victim did not back down, neither did appellant.

The evidence does not suggest that appellant was under attack or threatened with attack by any members of the crowd at the time he chose to use deadly force on the victim. In fact, uncontradicted testimony indicated that by the time Offney, the victim's friend, hit appellant, multiple

stab wounds had already been inflicted on the victim, and the fighting between appellant and the victim stopped after Offney hit appellant. Under Maryland law, Offney was in fact entitled to intervene in defense of the victim. *See* art. 27, sec. 12A, Md.Ann.Code (1982 Repl.Vol.); *Alexander v. State,* 52 Md.App. 171, 175–77, 447 A.2d 880, *aff'd,* 294 Md. 600, 451 A.2d 664 (1982). *Cf. Jacobs, supra,* 32 Md.App. at 510–11, 363 A.2d 257 (jury instruction of self-defense appropriate where appellant testified he feared for his life and fired a weapon after multiple assailants had approached him with bats, clubs and tire iron).

The police officer's statement that he feared a little bit for his safety because of the size of the crowd does not provide a reasonable ground for believing deadly force was necessary. The police officer testified that the only people involved in the struggle were the victim and appellant. With the exception of Offney's intervention, *after* deadly force had been employed, appellant was not threatened or attacked by any members of the crowd.

There was no evidence to demonstrate that appellant reasonably believed the victim to be armed. We do not equate with such belief his pre-trial statement that he saw the victim "putting a ring or something on his right hand." The evidence reveals only that the victim fought with his fists and wrestled with appellant. There was nothing to indicate the unarmed attack involved especially violent force. Finally, there was no testimony respecting appellant's awareness of any prior violent conduct on the part of the victim which might reasonably have led him to believe he was in danger of grievous injury or death. *Cf. Gunther v. State,* 228 Md. 404, 407–09, 179 A.2d 880 (1962).

While the question whether the force used in a given case was unreasonable is usually one for the trier of fact, *Falcon v. State,* 4 Md.App. 467, 472, 243 A.2d 631 (1968), *cert. denied,* 251 Md. 748 (1969); *Brown v. State,* 4 Md. App. 261, 268, 242 A.2d 570, *cert. denied,* 251 Md. 747 (1968), we believe the level of force employed by appellant

was so grossly excessive that the court properly determined as a matter of law, that he was not entitled to a self-defense instruction.[1]

In light of the above conclusion, we need not consider whether appellant presented sufficient evidence to establish the other elements of self-defense. We note, however, that appellant could similarly have been denied an instruction as to self-defense for the further reason that the evidence did not establish that he subjectively believed in the necessity of employing deadly force (*see infra*, section II).

## II

Appellant's second contention is that the trial court erred in refusing to instruct the jury on imperfect self-defense.

 Whereas perfect self-defense requires not only that the accused "subjectively believed that his actions were necessary for his safety, but objectively, that a reasonable man would so consider them," imperfect self-defense "requires ... a subjective, honest belief on the part of the [accused] that his actions were necessary for his safety, even though, on an objective appraisal by a reasonable man, they would not be found to be so." *Faulkner v. State*, 54 Md.App. 113, 115, 458 A.2d 81 (1983), *aff'd*, 301 Md. 482, 483

---

**1.** We also note that although we earlier assumed appellant was not the initial aggressor, he became the aggressor by escalating an otherwise non-deadly affray to the deadly level. In *Tipton v. State*, 1 Md.App. 556, 562, 232 A.2d 289, *cert. denied*, 247 Md. 742 (1967), we held that "where one attacks another in a manner not calculated to kill or to do serious bodily harm, and the defender counterattacks, using excessive and unreasonable force in a manner reasonably calculated to cause death or great bodily harm, then the original attacker becomes the defender." Under the rule of *Tipton*, appellant became the aggressor when he began to stab the unarmed victim with a knife. Moreover, a non-deadly aggressor, that is, one who uses only his fists or some non-deadly weapon, who is met with deadly force in defense may, in fact, "justifiably defend himself against the deadly attack. This is so because the aggressor's victim, by using deadly force against non-deadly aggression, uses unlawful force." W. LaFave & A. Scott, *Criminal Law*, at 549 (2d ed. 1986). *See also Tipton, supra*, 1 Md.App. at 562, 232 A.2d 289; R. Gilbert & C. Moylan, *Maryland Criminal Law: Practice & Procedure* at 8–9 (1983).

A.2d 759 (1984). An accused may be entitled to invoke the doctrine of imperfect self-defense even where he subjectively but unreasonably believed he needed to escalate a nondeadly combat to the deadly level. *Shuck, supra,* 29 Md. App. at 43, 349 A.2d 378. One who is the aggressor in an encounter, however, is not entitled to invoke the imperfect self-defense doctrine, even though he honestly (but unreasonably) believed that he was required to use the level of force employed in order to defend himself. *Cunningham, supra,* 58 Md.App. at 255–57, 473 A.2d 40; *see also Simmons v. State,* 66 Md.App. 629, 632, 505 A.2d 577 (1986). Only where evidence has been produced which establishes both elements is the accused entitled, on request, to an imperfect self-defense instruction. *Simmons, supra,* 66 Md.App. at 632, 505 A.2d 577.

■ Where successfully invoked, the imperfect self-defense doctrine does not completely exonerate the accused; it merely serves to negate malice. *Faulkner, supra,* 301 Md. at 486, 483 A.2d 759. Thus, it would operate to reduce the offense of murder to manslaughter and the offense of assault with intent to murder to simple assault, at most. *Id.* at 486, 504, 483 A.2d 759.

■ Appellant did not testify at trial that he used deadly force against the victim because of any subjective fear that he was in imminent peril of death or serious bodily injury. Nonetheless, he contends that the existence of such a belief may be inferred from the evidence presented. Before examining his specific contentions, we note, initially, that the record is not utterly devoid of evidence respecting appellant's state of mind. At trial, appellant testified that his mind was a complete "blank" during the incident. He was "dazed," "lost" and "light-headed" as a result of his state of intoxication and the blow he received to his head. In pre-trial statements appellant said he went into a rage after the victim knocked him down and insisted he did not realize what had happened until after the fight was over and *then* became scared and threw the knife away. He claimed that,

not realizing the knife was in his hand, he punched the victim in "self-defense." He did not state he felt it necessary to stab the victim to defend himself. The evidence leads to the conclusion that appellant subjectively experienced various emotions during the fight, but fear was not one of them. Moreover, appellant's repeated assertions that his mind was a "blank" during the incident are inconsistent with and belie a fearful state of mind.

We have previously noted that in determining whether mitigating circumstances exist in a given case to reduce murder to manslaughter we generally find that the accused is the only one who can attest to the fact that he committed the homicide while in a heat of passion. *Tripp v. State*, 36 Md.App. 459, 469, 374 A.2d 384 (1977); *Bartram v. State*, 33 Md.App. 115, 175, 364 A.2d 1119 (1976). While it is not inconceivable that without testimony from the accused as to a state of fear, other evidence might be sufficient to permit an inference as to an accused's subjective beliefs, we do not believe the evidence in this case was sufficient to raise such an inference.[2]

Appellant contends that his subjective although unreasonable belief in the need to use deadly force may be inferred from the very same evidence which we previously found failed to provide basis for a reasonable belief on his part

---

[2]. In other situations in which we have held the right to an "imperfect" defense may have existed, evidence has generally been presented respecting the accused's state of mind. *See Law v. State*, 29 Md.App. 457, 462–63, 349 A.2d 295, *cert. denied*, 278 Md. 726 (1975) (issue of imperfect defense of habitation generated where there was testimony that the accused's home had previously been burglarized and that the accused was scared when he heard prowlers at the door and shot and killed a policeman); *Wentworth v. State*, 29 Md.App. 110, 116, 349 A.2d 421, *cert. denied*, 278 Md. 735 (1975) (issue of imperfect defense of duress generated where appellant testified she feared being killed at any minute). *But see Shuck, supra*, 29 Md.App. at 43–44, 349 A.2d 378 (issue of imperfect self-defense generated even if appellant's belief he had a right to intervene in defense of his companion was erroneous and even assuming further that his use of deadly force against non-deadly force was unreasonable). As discussed *infra*, the *Shuck* case is distinguishable from the matter *sub judice* as appellant's own testimony negated the possibility he felt it necessary to use a deadly weapon.

that the victim intended to inflict grievous injury or death. We disagree.

That the police officer, breaking up a fight with a crowd of people around him, may have feared a "little bit" for his safety says nothing respecting whether appellant feared *far more* than a little bit for his safety. With respect to Offney's blow to appellant's head, we have already noted that Offney's uncontradicted testimony was that appellant had already knifed the victim before Offney intervened. Appellant's state of mind *after* the use of the deadly weapon is not relevant to whether he subjectively believed during the fracas that the use of deadly force was necessary. Again, the fact that the match was "fairly even" would only tend to support the inference that appellant did not fear for his safety. If the victim did not yield, neither did appellant. The initial blow suffered by appellant when knocked against the car does not, when viewed in context with all the other evidence, give rise to any reasonable inference that appellant, the larger of the combatants and a successful wrestler, honestly believed it was necessary to use deadly force to defend himself.

While someone in appellant's position might have entertained an honest but unreasonable belief that he needed to use deadly force to defend himself, the evidence furnishes no indication that appellant did, in fact, so believe. *Cf. Simmons, supra*, 66 Md.App. at 632–34, 505 A.2d 577. As a matter of law, therefore, he was not entitled to an instruction on imperfect self-defense.[3]

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

_____

**3.** We note, finally, that the trial judge instructed the jury that "if the defendant actually believed it was necessary to act as he did, whether his belief was reasonable or not, then there would be no malice," and that if malice were absent, the defendant could not be found guilty of assault with intent to murder or the murder charge. The jury obviously concluded appellant did not entertain an actual belief in the necessity to use deadly force.