708 A.2d 1154

**William REDCROSS, Jr.**

v.

**STATE of Maryland.**

**No. 1440, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

May 4, 1998.

**322**

John L. Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Attorney for Baltimore County, Towson, on the brief), for appellee.

Argued before MOYLAN, THIEME and KENNEY, JJ.

THIEME, Judge.

A jury in the Circuit Court for Baltimore City convicted William Redcross, Jr., of first degree murder and first degree assault. On appeal, he raises three issues for our consideration, all of which pertain to jury instructions:

1. Did the trial court give an erroneous instruction on the duty to retreat when the appellant asserted that he had acted in self-defense?

2. Was the trial court's failure to instruct the jury on heat of passion manslaughter plain error?

3. Did the trial court give an erroneous instruction in response to a jury note requesting a definition of "mitigating circumstances?"

A narrow, but very important, question regarding self-defense is raised in this case: Was it reversible error to fail to instruct

the jury on the appellant's awareness of an avenue of retreat? We agree with the appellant that the trial court's instruction regarding self-defense was deficient and will reverse the judgment of the trial court and remand for a new trial. We do not reach the subsequent issues raised by the appellant.

### *Factual Background*

The incident in question appears largely to have been the result of the appellant's jealous rage at his former girlfriend, Charisse Clough. The appellant and Ms. Clough had been involved for some fourteen months before Ms. Clough initiated a break-up in late October of 1996. According to Ms. Clough, the appellant did not take well the news of her desire to end the relationship, and on 26 October 1996, when the appellant and Ms. Clough were at her house dividing property obtained during the relationship, Walter Spencer, the victim, telephoned Ms. Clough. While Ms. Clough was speaking to the victim, the appellant hollered to the victim to leave Ms. Clough alone and further threatened to kill him or "put him in Shock Trauma." After the telephone conversation ended, the appellant again threatened the victim as well as Ms. Clough.

The following evening, Ms. Clough went to Ziggy's Bar and Restaurant, accompanied by her sister, Sandy Wallett, Damien Smith, and the victim. Ms. Clough informed one of the bouncers at the bar that she had been having problems with the appellant, and she requested that the bouncer notify her if the appellant arrived at the bar. Some time later she was informed that the appellant was outside.[1] After approximately forty-five minutes, Ms. Clough and her friends left Ziggy's and encountered the appellant outside of the bar. It is at this point that the testimony at trial diverged, describing two very different versions of what ensued.

Ms. Clough, her sister, Damien Smith, and bouncers Alexander Gaither and Ronnie Minter testified as to one version of events. According to them, when the group of four exited the

---

1. The appellant had been refused entry into the bar by one of the bouncers.

bar they encountered the appellant, who was yelling at the group. The four then walked over to Ms. Wallett's vehicle and got inside. The appellant followed and, still yelling, kicked the car door and pulled out a knife, stating that he "was gonna send somebody to Shock Trauma tonight." After the appellant waived the knife at Ms. Clough and argued with her, Damien Smith exited the vehicle. He walked toward the appellant swinging a belt provided by Mr. Gaither in an apparent attempt to dislodge the knife from the appellant's grasp as the appellant simultaneously approached Damien Smith. The victim, who had also exited the vehicle, approached the appellant from behind while the confrontation between the appellant and Damien Smith was taking place. It was then that the appellant turned and fatally struck the victim in the chest with the knife. After the stabbing, Mr. Minter struck the appellant across the back with a bar stool as the appellant approached the owner of the bar with his knife. When the owner pulled out a gun, the appellant discarded the knife and fled.

The version of events relayed by the appellant at trial was quite different from that of the other witnesses. According to the appellant, when he first arrived at Ziggy's he noticed Ms. Wallett's vehicle. He admitted to carrying the knife with him as he exited his vehicle, but only because a previous phone conversation with the victim had placed him in fear for his life.[2] He became upset when he was denied entrance to the bar, but the appellant maintained that he did not want to cause any trouble. As the appellant began to walk away he heard Ms. Wallett call to him. At that point, he saw Ms. Clough, accompanied by the victim, and he told the victim that he and Ms. Clough were still seeing each other and that if the victim was the same man that he had previously spoken to on the telephone he did not want any trouble. When the appellant and Ms. Clough began to argue, Mr. Gaither rushed

---

2. According to the appellant, he had spoken to the victim on the telephone once before, and during that conversation the victim "made Appellant feel threatened and upset."

toward the appellant in a "threatening manner." The appellant became angry and walked over to the vehicle occupied by Ms. Clough and her companions, striking the window and kicking the door. The appellant observed Damien Smith exit the vehicle, and the appellant attempted to retreat toward his own vehicle but was stopped by a blow to the back. When he turned around he saw a man with a stool in his hand. The appellant also saw Damien Smith coming toward him and the victim behind him. Damien Smith then began to strike the appellant in the face with the belt. As the appellant further testified:

And when it [the stool] hit me it like almost knocked me down. Like I said, I thought I'd ran into a car that was coming up through there or something, and I glanced over my shoulder and all I could see was this guy standing there and he had a stool in his hand.

And then I, it was like it happened so fast. I glanced back at Mr. Smith and he was like walking towards me, you know, cause I wasn't two foot from the car, you know, we was just that close together.

And then I glance over here. It was just like a rhythm thing, because I was standing right by the car. The car is here, and this, it, somebody coming around this side of the car, which I later learned was Mr. Spencer.

\* \* \*

I could see Mr. Spencer and he had something black in his hand. I couldn't see what it was because of the light in there. . . . Next thing I know, I glance, I look and he's maybe like a foot from me. And I had my arm up like this, cause I was protecting my face from getting hit with the belt. And then next thing I know, just glancing. I just pivoted like, and went like that. And I seen, I seen Mr. Spencer turn sideways and back up.

The appellant further maintained that his turning around and stabbing the victim was "just like a reflex pivot" and his wielding the knife at the victim was "a defensive move just to try to back him off."

The jury obviously chose to believe the testimony of Ms. Clough and her companions over that of the appellant. After he was convicted of first degree murder of the victim and first degree assault of Damien Smith, the trial court sentenced the appellant to life imprisonment plus twenty-five years consecutive. This timely appeal followed.

### Standard of Review

Maryland Rule 4–325(c) provides that a trial court "may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." When the trial court does so instruct the jury, it has a duty "to provide an accurate *and complete* statement of the law." *Gainer v. State*, 40 Md.App. 382, 392, 391 A.2d 856 (1978) (emphasis supplied). We, as a reviewing court, must determine whether "the requested instruction was a correct statement of the law; whether it was applicable under the facts of the case; and whether it was fairly covered in the instructions actually given." *Gunning v. State*, 347 Md. 332, 348, 701 A.2d 374 (1997) (quoting *Grandison v. State*, 341 Md. 175, 211, 670 A.2d 398 (1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996)); *Ellison v. State*, 104 Md.App. 655, 660, 657 A.2d 402, *cert. denied*, 340 Md. 216, 665 A.2d 1058 (1995); *Sangster v. State*, 70 Md.App. 456, 473, 521 A.2d 811 (1987), *aff'd*, 312 Md. 560, 541 A.2d 637 (1988). In making that determination, we view the instructions as a whole and not in isolation or out of context. *Brooks v. State*, 104 Md.App. 203, 213, 655 A.2d 1311, *cert. denied*, 339 Md. 641, 664 A.2d 885 (1995).

### Instruction on Self–Defense

At trial, the appellant maintained that he acted in self-defense when stabbing the victim. Thus, in its instructions to the jury, the trial court included the following:

Self-defense, as I've just told you, is a complete defense and you would be required to find the Defendant not guilty if all of the following five factors are present. First, the Defendant was not the aggressor or, although the Defen-

dant was the initial aggressor, he did not raise the fight to the deadly force level; second, that the Defendant actually believed that he was in immediate and imminent danger of death or serious bodily harm; third, that the Defendant's belief was reasonable; fourth, that the Defendant used no more force than was reasonably necessary to defend himself in light of the threatened or actual force and, fifth, *that the Defendant had a duty, when defending himself outside of his home, to retreat or avoid danger if the means to do so were within his power and consistent with his safety. However, where peril is so imminent that he cannot retreat safely, he has a right to stand his ground and defend himself.*

(Emphasis supplied.) The appellant takes issue only with the italicized portion of the above instruction. Specifically, he claims that this language in the instruction constituted reversible error because "it did not adequately instruct the jury on a crucial factor in this case, Appellant's awareness of an avenue of safe retreat." At trial, defense counsel excepted to the instruction given by the trial court and requested, citing the criminal pattern jury instructions,[3] that the jury specifically be instructed as to the appellant's awareness of an avenue of retreat. The trial court, although noting defense counsel's exception for the record, did not include the requested modification in its instructions to the jury.

In order for an accused successfully to claim self-defense in the case of a homicide, the following elements must be present:

(1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

---

**3.** The Maryland Pattern Jury Instruction dealing with self-defense provides, in relevant part:

In addition, before using deadly force, the defendant is required to make all reasonable effort to retreat. The defendant does not have to retreat if . . . the avenue of retreat was unknown to the defendant. . . . MPJI–Cr 5:07.

(2) The accused must have in fact believed himself in this danger;

(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

(4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*State v. Faulkner,* 301 Md. 482, 485–86, 483 A.2d 759 (1984). If all of the aforementioned elements are present, self-defense acts as a complete defense to the offense and the result is an acquittal. *Id.* at 485, 483 A.2d 759. If, on the other hand, " 'the defendant honestly believed that the use of [deadly] force was necessary but ... this subjective belief was unreasonable under the circumstances,' an imperfect self-defense would exist and the defendant would be guilty only of manslaughter." *Rajnic v. State,* 106 Md.App. 286, 292–93, 664 A.2d 432 (1995) (quoting *Dykes v. State,* 319 Md. 206, 213, 571 A.2d 1251 (1990)).

In cases in which self-defense is claimed, the accused normally has a duty to retreat. In other words, except in limited circumstances,[4] the accused must make all reasonable efforts to withdraw from the encounter before resorting to the use of deadly force. *Corbin v. State,* 94 Md.App. 21, 25, 614 A.2d 1329 (1992). One exception to that general rule is where the avenue of retreat, though a possible means of escape, is unknown to the accused. It is that exception which we now consider.

---

**4.** The accused does not have a duty to retreat, even at the deadly force level, in the following situations: if the accused is attacked in his or her own home, *Gainer,* 40 Md.App. at 388, 391 A.2d 856; if the avenue of retreat is unsafe, *Barton v. State,* 46 Md.App. 616, 420 A.2d 1009 (1980); if the nonaggressor victim is lawfully arresting the aggressor; or if the nonaggressor victim is the robbery victim of the aggressor. The most common exception to the retreat rule is the "castle doctrine": there is no duty to retreat if one is attacked in his or her own home. *See e.g. Gainer,* 40 Md.App. at 388, 391 A.2d 856. Because none of those exceptions is an issue in the case at bar, we need not discuss them further.

In the case at bar, the instruction relating to the appellant's duty to retreat was taken directly from our decision in *Lambert v. State*, 70 Md.App. 83, 519 A.2d 1340, *cert. denied*, 309 Md. 605, 525 A.2d 1075 (1987). In *Lambert* we commented that

> it is the duty of the defendant, when defending himself outside the home, to retreat or avoid the danger if the means to do so are within his power and consistent with his safety. Where, however, the peril is so imminent that he cannot retreat safely, he has a right to stand his ground and defend himself.

*Id.* at 92, 519 A.2d 1340. That language was subsequently reaffirmed in the recent Court of Appeals decision in *Burch v. State*, 346 Md. 253, 282–83, 696 A.2d 443, *cert. denied*, —— U.S. ——, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997).

The State maintains that "[t]he trial judge's definition of self-defense as a whole, and of the duty to retreat in particular, was an accurate statement of the long-established legal standard." We agree with the State in one limited regard: the instruction given by the trial court was an *accurate* statement of the law. In fact, as the trial court readily acknowledged and as previously discussed, the instruction was taken practically verbatim from our decision in *Lambert*. Our inquiry cannot end there, however. As *Gainer* makes clear, the trial court has a dual obligation with regard to jury instructions—it must not only instruct *accurately* but also *completely*. This is where we part ways with the State. The statement taken from *Lambert* was undisputably accurate. Whether the means to retreat are "within his power and consistent with his safety" is not the same thing as whether "the avenue of retreat is known." The former implies a physical ability to retreat; the latter denotes an awareness of an avenue of retreat, regardless of that physical ability. Thus, the question becomes: Did the appellant successfully generate the issue of whether an avenue of retreat was known?

It is well-established that, in order to be entitled to a requested instruction, an accused must produce "some" evi-

dence regarding the awareness of an avenue of retreat. In *Dykes v. State*, 319 Md. 206, 571 A.2d 1251 (1990), the Court of Appeals clarified that standard:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.

*Id.* at 216–17, 571 A.2d 1251 (emphasis in original); *accord Corbin v. State*, 94 Md.App. at 26, 614 A.2d 1329. As previously mentioned, one component of self-defense is the duty to retreat. Thus, if the appellant produced "some" evidence that he had no duty to retreat because he was unaware of an avenue of safe retreat, he would be entitled to a jury instruction, and the State would thus be saddled with the burden of proving, beyond a reasonable doubt, that the appellant *did not* avail himself of a known avenue of safe retreat.

 Contrary to the State's assertions, the appellant did produce during the trial *some* evidence that he was unaware of an avenue of safe retreat. On direct examination, the appellant explained at length that, while outside of Ziggy's after he and Ms. Clough had argued, he had been surrounded by Mr. Smith wielding a belt, Mr. Gaither with a stool in his hand, and Mr. Spencer with something in his hand that the appellant believed could have been a weapon. The appellant further testified that his turning around and stabbing the victim was only "a defensive move" to "back [the victim] off." He also described how he was "stopped dead in [his] tracks" by a blow

to the back with the bar stool. Additionally, on cross-examination, the following transpired:

**Q:** And, again, nothing was blocking or preventing you from walking away at that time; isn't that correct, sir? Yes or no?

**A:** The gentleman was way behind me, ahead with the stool. The gentlemen was still with the stool. The gentlemen hit me with the stool, and he just backed up and he was waving it. It just happened in matter of—it just happened all together.

\* \* \*

**Q:** So you after you were hit with the stool, at that time, did you call 911 and complain again you just been hit with the stool?

**A:** I couldn't. *I mean, they had me blocked in.* The car was in front of me, one on each side of me, and the guy behind me with the stool and then I was arrested after that. (Emphasis supplied.)

The State attempted to rebut the appellant's position that he had no ability to retreat. On direct examination by the State, Ms. Clough testified as follows:

**Q:** Now, prior to that time [when the appellant was swinging the knife], was there anything blocking Mr. Redcross from just walking away?

**A:** No.

Ms. Wallett offered similar testimony of the scene just prior to the stabbing:

**Q:** Was there anyone standing directly to the right of Mr. Redcross?

**A:** Not that I know of.

**Q:** Was there anyone standing to the left of Mr. Redcross at that time?

**A:** No.

**Q:** Was there anyone standing behind Mr. Redcross at that time?

**A:** No.

**Q:** When Mr. Redcross struck Mr. Smith, was there anyone to the left of him at that time?

**A:** There was no one around him.

**Q:** Left, right or back?

**A:** No, any of them.

**Q:** Was there anything at any time between the confrontation Mr. Redcross to Mr. Smith or Mr. Spencer? Was there anything physically—a pole, a car or anything blocking Mr. Redcross at that time?

**A:** No, there wasn't.

Mr. Gaither and Mr. Smith made similar statements during the trial.

The foregoing testimony leaves little doubt that a factual issue existed as to (1) whether the appellant could have retreated before Mr. Spencer was fatally wounded, and (2) whether the appellant was aware of an avenue of retreat if one did, in fact, exist. Furthermore, the fact that the appellant was the sole witness to testify that he did not know of an avenue of retreat or that he could not feasibly have retreated from the confrontation is of no import. As this Court has held previously, the issue of self-defense can be generated solely from the uncorroborated statements of the accused. *Watkins v. State,* 79 Md.App. 136, 139, 555 A.2d 1087 (1989) ("Although the vast majority of the witnesses testified that it was the appellant who first picked up the knife and stabbed the victim, the appellant testified otherwise.... Since the appellant did testify as a competent witness, there was obviously *some evidence* before the jury which, *if believed,* generated the issue calling for the requested instruction.")(emphasis in original). Accordingly, although clearly the vast majority of the witnesses testified that the appellant had, in fact, an avenue of safe retreat available to him, the appellant testified to the contrary, and his uncorroborated testimony was enough to generate the issue.

In sum, the appellant's position that he did not retreat because he was unaware of a safe avenue of retreat was "supported by the evidence." *Lambert v. State,* 70 Md.App. at 91, 519 A.2d 1340. It was not, however, "fairly covered by the instructions actually given," and the trial court thus erred in refusing to give the requested instruction.

**JUDGMENTS REVERSED; COSTS TO BE PAID BY BALTIMORE COUNTY.**