Donald BRALEY, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 86–56.

Supreme Court of Wyoming.

Aug. 5, 1987.

Wyoming Public Defender Program, Leonard D. Munker, State Public Defender, Julie D. Naylor, Appellate Counsel, Cheyenne, for appellant.

A.G. McClintock, Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., David K. Gruver, Asst. Atty. Gen., Cheyenne, for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

BROWN, Chief Justice.

In this case, the resulting homicide was the culmination of a dispute over parking. Danny Gregorio parked his vehicle at the curb in front of an apartment occupied by appellant Donald W. Braley and Braley's wife, Pam, and appellant or his wife ordered Gregorio to move his car. Thereafter, appellant and his wife traded insults with Gregorio and his friends and the exchange of pleasantries escalated into a shouting match. At that time, appellant went into his apartment and procured a gun and after firing a warning shot, he shot and killed Danny Gregorio. A jury convicted appellant of second-degree murder.

The issues on appeal raised by appellant are:

"I

"Whether it was error to exclude Dr. Merrell's testimony as to the state of mind of the Defendant.

"II

"Whether it was error to limit the extent of defense investigation into the alleged jury tampering.

"III

"Whether it was error to refuse jury instructions pro-offered [sic] by the defense.

"IV

"Whether it was error to exclude the past arrest history of the victim.

"V

"Whether there exists insufficient evidence to support Appellant's conviction of second degree murder."

We affirm.

On August 22, 1985, the victim, Danny Gregorio, while driving his wife's Cadillac, picked up Benny Pena and the twosome proceeded to the residence of John Barnes. The purpose of the visit to the Barnes' house was to talk to Barnes about painting a car for Gregorio. Gregorio stopped his car in the street near the apartment of appellant Donald Braley and his wife, Pam, in order to talk with Barnes. Gregorio was in the driver's seat of the parked Cadillac, Pena in the passenger's seat, and Barnes leaned through the driver's window while the trio conferred. While this conference was ongoing a blue Trans Am drove up behind the Cadillac and honked. Gregorio did not move the Cadillac, so the Trans Am

backed up and went around the parked vehicle. At this juncture Barnes said to Gregorio that the owners of the Trans Am were his neighbors and that they likely would call the police. Danny Gregorio thereupon pulled the Cadillac over to the curb and parked it in front of the Braley apartment.

A half hour later the Trans Am returned and pulled up behind the parked Cadillac. Appellant and his wife Pam got out of the Trans Am and confronted Gregorio, Pena and Barnes. Appellant demanded that the Cadillac be moved. The Braleys, Gregorio, Pena and Barnes all became involved in the imbroglio that followed. As would be expected, all principals in the parking space fracas had been drinking before the fact.

Demands, insults and threats were exchanged. Verbal exchanges escalated into shoving and hitting. Appellant said he saw the passenger (apparently Pena) with a knife although no knife was ever found. Appellant went into his house, loaded his rifle and returned to the scene of the confrontation. He fired a shot into the air. Only Pena and Barnes exhibited good judgment and upon hearing the shot they ran.

Gregorio tarried, and said to appellant, "What are you going to do, shoot me with your gun?" Appellant did. Appellant then walked over to Gregorio, who was lying on the ground, and said, "Get up, you're not shot."

After the shooting appellant called the police and said someone had hit his head and he needed an ambulance. Appellant also said to his wife, "Pam, come here, we've got to get our stories together."

Appellant was charged with first degree murder. At trial he relied on two theories of defense: accident and defense of his wife, Pam. Appellant was convicted of second degree murder and sentenced to the penitentiary for not less than 20 years nor more than 25 years.

### I

■ At trial appellant called Dr. Arthur N. Merrell, a psychiatrist as a witness. The purpose of Dr. Merrell's testimony ac-cording to appellant was to describe "Defendant's reaction to the events of the night in question, and whether such reaction was reasonable from the perspective of what causes fear, and how fear develops." Also, according to appellant, "The substance of the testimony was directed at whether or not the Defendant's actions were reasonable actions of self-defense under all the circumstances."

However, the trial court disallowed the testimony and appellant made an offer of proof. Dr. Merrell noted in the offer of proof eight or nine factors (defense counsel characterized these factors as "stressors") present at the scene of the shooting "that would or could or did trigger fear." The doctor concluded that appellant's "judgment is not as clear as it might be." Dr. Merrell further stated " * * * [I]t does appear that his (appellant's) judgment was fairly well affected by his fear. * * *" The offer of proof concluded:

"Q. Okay. Now, let me ask you a couple of questions: Would the fear that he had impair his motor function, you mentioned handling the rifle?

"A. Struggling with the rifle, yeah.

"Q. Okay. Could it impair his blood pressure or cause a change?

"A. You know, fear can affect the body by increasing—well, by changing a lot of bodily functions.

"Q. Okay. Pulse?

"A. Yes, pulse going up, heart rate going up, blood pressure increasing, getting peripheral vasodilatation, excitement, alertness increasing and so forth.

"Q. How about judgment?

"A. I think that fear can certainly impair judgment.

"MR. MUNKER: That's my offer, Your Honor."

The trial court rejected the offer of proof and held that fear and stress are emotions understood by the jury. The court stated:

" * * * [I]t is within the ken (perception, understanding, knowledge or vision) of the juror that is there either was or was not an assault in response to which the defendant was either justified or not justified in believing himself to be in immi-

nent danger, and that he either did or did not behave as a reasonable person similarly situated. That's the reason we have jurors. They set the standard of reasonableness with regard to these kind of issues, not surrendering this judgment of that to that of an expert."

We agree with the trial judge.

Rule 702, Wyoming Rules of Evidence, provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

" * * * The 'aura of special reliability and trustworthiness' surrounding scientific or expert testimony, particularly calls for trial court discretion. * * * [Citation.]" *Buhrle v. State*, Wyo., 627 P.2d 1374, 1377 (1981).

The trial court's decision to admit or reject expert testimony is a decision solely within the sound discretion of the trial court and will not be reversed without a showing of clear and prejudicial abuse. *Buhrle v. State*, supra; and *Smith v. State*, Wyo., 564 P.2d 1194 (1977).

■ " * * * [I]n the ordinary self-defense fact situation it is not necessary to rely upon expert testimony to explain the perception of the accused at the moment of crisis when he or she resorts to the use of deadly force. * * * " *Jahnke v. State*, Wyo., 682 P.2d 991, 1013 (1984).

In *Buhrle v. State*, supra, at 1376, we said:

"The criteria to be used in determining the admissibility of an expert witness' testimony are set out in *Dyas v. United States*, 376 A.2d 827, 832 (D.C.C.A.1977), cert. denied 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977). As stated by the court:

" '(1) * * * the subject matter "must be so distinctively related to some science, profession, business, or occupation *as to be beyond the ken of the average layman* [emphasis added]";
(2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth* [emphasis added]"; (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." ' McCormick on Evidence, § 13, pp. 29–31 (2d Ed.1972)."

In *Smith v. State*, supra, at 1199, we stated:

"Expert testimony is appropriate when the subject of inquiry is one which jurors of normal experience and qualifications as laymen would not be able to decide without the technical assistance of one having unusual knowledge of the subject by reason of skill, experience or education in the particular field. [Citations.]
* * *

"The ultimate fact needed for a determination of the degree of the crime was the state of mind of the accused at the time of the shooting. Such a subjective conclusion must be found by the jury. The doctor could give jury members no more help than they already had from the facts. Under such circumstances, his conclusion was one which the jurors could draw for themselves. [Citation.]
* * * * "

Also, in *Krucheck v. State*, Wyo., 702 P.2d 1267, 1271 (1985), we stated:

" * * * Reaction to stress and excitement is something experienced by all of mankind. It is a matter of common knowledge within the experience of lay persons and hardly a subject for expert testimony. We have said, to be admissible, the subject matter must be so distinctively related to some science, profession, business, or occupation as to be beyond the ken of the average layman. [Citations.] * * * "

■ We hold that fear and stress are emotions experienced by all mankind and are not distinctively related to some science, technical or specialized knowledge.

We agree with the trial judge that the testimony of Dr. Merrell would not be helpful to the jury.

## II

Appellant contends that it was error for the court to limit investigation of alleged jury tampering.

In the middle of the trial, defense counsel's secretary, Ms. Daniels, received an anonymous phone call. The caller said that he had been attending the trial, and wanted to let the public defender, Leonard Munker, know that two of the jurors knew Gregorio personally. The caller described the jurors: one was a black woman and the other was an older woman, heavyset, about 47, maybe sitting two or three people from the left in the front row of the jury box. The caller would not give his name or phone number, but did agree to call back later. The court allowed Ms. Giles, the only black woman on the jury, to be questioned.

After evening recess, the court met in chambers with counsel and with Ms. Daniels. Ms. Daniels was sworn in and questioned about the phone call. She repeated what was said and stated that the caller had not called back that day. Although the court said that it felt it knew who the individual was, a Mr. Mike Evans, a convicted felon, the court also said that the individual had not identified himself nor provided anything that it could take cognizance of. The next day defense counsel received a telephone call from the anonymous caller. This conversation was recorded by defense counsel and was thereafter played for the court. At that time, defense counsel recalled John Barnes because the caller indicated Mr. Barnes had additional information. The substance of the tape recorded conversation was that Mike Gregorio, the father of the victim, had two of the jurors in his pocket. The court concluded that the caller was indeed Mr. Evans, and that they should continue with the trial and allow the matter to be developed later.

After the trial, appellant was allowed to approach jurors subject to Rule 702, Uniform Rules for the District Courts of the State of Wyoming.

On February 4, 1986, appellant filed a motion for a new trial alleging newly discovered evidence, which was based on evidence discovered regarding the jury. The evidence was that defense counsel had talked to one of the jurors, and had been told that when the jury went to deliberate, Ms. Giles and Ms. Kardong, the two women who had been mentioned by the anonymous caller, had informed other jurors that they were voting for first degree murder and that they would not change their minds nor consider a conviction on any lesser offense. The juror questioned by counsel also said that the remainder of the jurors were torn between manslaughter and second degree murder. Finally, Ms. Kardong voted for second degree murder, and after more discussion, Ms. Giles agreed to also go along with that verdict. Appellant argues that new evidence supported the tip that Mike Gregorio had two jurors in his pocket, and that a new trial should be granted. Appellant says that but for the adamant positions of Ms. Kardong and Ms. Giles, the other jurors might have returned a verdict of guilty of manslaughter.

This court remanded this portion of the case back to the district court for the limited purpose of considering the motion for new trial.

During the first hearing pursuant to the remand, Judge Edward L. Grant heard argument, but declined to hear witnesses and the matter was continued. The next hearing was held before Judge Joseph F. Maier. At that time, jurors Giles and Kardong, jury foreman Nantz, and Mike Gregorio were called to testify. The questions posed to the jurors were limited to whether or not any of them had been approached by any outside source during the course of the trial, and whether they had been influenced by any outside source. Mr. Gregorio was questioned as to whether or not he had had any contact with any of the jurors. Each witness denied any contact or influence. Defense counsel was not permitted to inquire further into the deliberations of the jury.

The state's position during the inquiry regarding alleged jury tampering was that appellant was making a broad and vague allegation impugning the jury system and that it was a fishing expedition. The prosecution also said that because the anonymous caller was identified as a convicted felon, his "tip" was unworthy of belief.

The trial court ruled that what had been presented did not support appellant's motion for a new trial and nothing impeached the jury's verdict. Accordingly, the motion for a new trial was denied.

Rule 606(b), W.R.E., provides:

"(b) *Inquiry into validity of verdict or indictment.*—Upon an inquiry into the validity of a verdict or indictment, *a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict* or indictment or concerning his mental processes in connection therewith, nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received, but a juror may testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." (Emphasis added.)

Notwithstanding protestations to the contrary, appellant urges that he should be able to go far beyond that permitted by Rule 606(b), and question the jurors with respect to their deliberations, emotions and feelings. In the absence of a body of case law in Wyoming interpreting Rule 606(b), W.R.E., we will consider what the federal courts have done with our identical rule.

■ Although a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, he may not testify regarding the jury's mental processes, or the influences that any particular evidence had upon the jury's conclusion, *United States v. Howard,* 506 F.2d 865 (5th Cir.1975), and further, a juror

may be questioned about extraneous information or outside influence but may not be interrogated about its impact on him or other jurors. *Brofford v. Marshall,* 751 F.2d 845 (6th Cir.1985). See also, 3 Weinstein's Evidence, § 606[05], pp. 606-40, 606-41 and n. 4 (1985); and 3 Louisell & Mueller, Federal Evidence, §§ 286-287 (1979). If a juror were permitted to testify about what another juror said, it would result in an unwarranted intrusion into jury deliberations. *United States v. Aimone,* 715 F.2d 822 (3rd Cir.1983). See also, *United States v. Crosby,* 294 F.2d 928 (2d Cir.1961), cert. denied sub nom, *Mittelman v. United States,* 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523, reh. denied 369 U.S. 881, 82 S.Ct. 1138, 8 L.Ed.2d 285 (1962); *Morgan v. Sun Oil Co.,* 109 F.2d 178 (5th Cir.1940), cert. denied 310 U.S. 640, 60 S.Ct. 1086, 84 L.Ed. 1408 (1940).

In *King v. United States,* 576 F.2d 432, 438 (2d Cir.1978), the court said:

"There is a judicial reluctance, for sound and easily understood reasons, 'to inquire into the state of mind of any juror and into the conduct of the jurors during their deliberations.' [Citations.] This is to avoid harassment of jurors, inhibition of deliberation in the jury room, a deluge of post-verdict applications mostly without real merit, and an increase in opportunities for jury tampering; it is also to prevent jury verdicts from being made more uncertain. [Citation.]

"To overcome this reluctance and to authorize a post-verdict inquiry, there must be 'clear evidence', 'strong evidence', 'clear and incontrovertible evidence', 'substantial if not wholly conclusive evidence.' [Citation.]"

See also, *Government of Virgin Islands v. Gereau,* 523 F.2d 140 (3d Cir.1975), cert. denied 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976).

■ The only restriction placed on appellant in his questioning of witnesses at the hearing on a motion for new trial were strictures specifically provided for in Rule 606(b), W.R.E. Otherwise, he was given wide latitude.

We find no error in the trial court's conduct of the hearing on a motion for new trial.

## III

■ In appellant's third issue he contends that the court erroneously rejected a self-defense instruction. One of his theories at trial and on appeal was that in defense of his wife he could lawfully take any action that she could have taken. We do not disagree. However, a defender is justified in using force only in those circumstances that the person being defended could use force. Furthermore, he cannot use greater force than the person being defended could use.

In *Leeper v. State*, Wyo., 589 P.2d 379, 383 (1979), we said:

"One asserting the justification of defense of another steps into the position of the person defended. Defense of another takes its form and content from defense of self. The defender is not justified in using force unless he or she reasonably believes the person defended is in immediate danger of unlawful bodily harm, and that the force is reasonable and necessary to prevent that threat. The defender can only use that degree of force necessary to relieve the risk of harm. [Citations.] * * *"

■ Appellant further contended that his wife may have been the aggressor in the brawl, and therefore, he was entitled to an instruction on the withdrawal of an aggressor. He proffered the following instruction designated "C," which was refused:

"Generally, the right to use self-defense is not available to one who is the aggressor or provokes the conflict. However, if one who provokes a conflict thereafter withdraws from it in good faith and informs his adversary by words or actions that he desires to end the conflict, and he is thereafter pursued, he then has the same right of self-defense as any other person."

The law of an aggressor's right to self-defense is stated in *Garcia v. State*, Wyo., 667 P.2d 1148, 1153 (1983):

" ' * * * [A] person who provokes or brings on the difficulty in which he kills his assailant cannot invoke the right of self-defense, unless he in good faith retreats *as far as he safely can, making that fact manifest to his adversary.*' * * * " (Emphasis added.) Quoting *State v. Flory*, 40 Wyo. 184, 276 P. 458 (1929).

The notion that appellant's wife may have been the aggressor and that she withdrew from the rumpus apparently did not occur to appellant until after all the evidence had been produced. He did not produce a shred of evidence in support of the theory of an aggressor abandoning the fight. In fact, appellant and his wife consistently denied any aggression on the part of Mrs. Braley. Testimony produced by the Braleys was that Gregorio, Pena, and Barnes were the aggressors from the beginning and were doing the hitting and shoving.

The six self-defense instructions given by the court adequately covered appellants self-defense theory and the testimony produced at trial by appellant. Appellant does not contend otherwise. Arguably, in the record of trial there may be a modicum of evidence that Mrs. Braley was the aggressor. However, there is not a scintilla of evidence that she abandoned her aggression. One wonders how she could abandon something that she claims she was not doing. It necessarily follows that she could not communicate abandonment when she did not abandon.

We find the agressor-abandonment instruction would have totally confused the jury and if anything would tend to cast doubt on appellant's entire theory of self-defense. Further, there was no competent evidence to support appellant's proffered instruction nor would a rational view of any evidence justify giving such instruction. The trial court properly refused to give appellant's proposed instruction C.

## IV

■ In the fourth issue appellant contends that "it was error to exclude the post arrest history of the victim."

In this issue we are concerned principally with Rules 401–404, W.R.E.

"Rule 401. Definition of 'relevant evidence.'

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

"Rule 402. Relevant evidence generally admissible; irrelevant evidence inadmissible.

"All relevant evidence is admissible, except as otherwise provided by statute, by these rules, or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible.

"Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"Rule 404. Character evidence not admissible to prove conduct; exceptions; other crimes.

"(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

"(1) Character of Accused.—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

"(2) Character of Victim.—Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

" * * *

"(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident."

We frequently find it necessary to consider the interrelationship of these four rules of evidence.

Under Rule 404(b), W.R.E., prosecutors oft seek to introduce evidence concerning a defendant's past misconduct. They contend that this evidence is admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, pattern, complete story or course of conduct. After this evidence has been admitted for a limited purpose set out in Rule 404(b), prosecutors have been known to subtly use such evidence to persuade the trier of fact that on a particular occasion the accused acted in conformity with the character trait described in the testimony. This, of course, is a subversion of Rule 404.

Similarly, one of the most ancient and successful defenses in homicide cases is to try the victim. That is to say, show the jury that the deceased was a bad person and deserved what he got and that society is none the worse for it. The trial court must balance the "giveth" provision of Rule 404(b), against the "taketh away" provision of Rule 403. That delicate balancing problem was presented to the trial court in the case before us.

At trial appellant attempted to introduce into evidence the arrest record (rap sheet) of the victim, Danny Gregorio. This record showed fourteen arrests, none for felonies. This history included shoplifting at age thirteen and the numerous other arrests involved taking tires, a traffic citation warrant, more than a few drinking and driving charges, and one public disturbance in which he was yelling. In only one of the arrests was any violence by the victim noted, and in that arrest, the physical violence

was not the reason for the arrest; rather it took place at the booking desk.

Appellant characterizes the victim's behavioral history as "uncivilized or civil disobedience." We do not disagree. However, there was nothing in the "rap sheet" suggesting the use of guns, knives or other weapons likely to result in death or bodily harm. Nor was any conduct described in the history suggesting life threatening behavior or behavior that might result in serious bodily harm.

Arguably, the bits and pieces of the record might support appellant's theory that the victim was the aggressor. However, this character trait did not go beyond incidents involving shoving, pushing, and yelling. The trial court was faced with the possible prejudice and confusion proscribed by Rule 403, W.R.E. In *Taylor v. State,* Wyo., 642 P.2d 1294, 1295 (1982), we said:

"It has been held generally that the admission of evidence is within the sound discretion of the trial court and absent a clear abuse of discretion will not be disturbed. It is also the general rule that the foundation, relevance, competency, materiality, and remoteness are within the sound discretion of the trial court and will be upheld on appeal absent a clear abuse of discretion."

After quoting *Taylor,* we said in *Jahnke v. State,* supra, at 1005:

"The burden of establishing the clear abuse of discretion must be assumed by the party who attacks the ruling of the trial court. *Buhrle v. State,* supra; *Nimmo v. State,* Wyo., 603 P.2d 386 (1979). That party must establish that the ruling of the trial court was erroneous and that it did affect substantial rights of the party. The trial court in the exercise of its discretion can exclude even relevant evidence when there are countervailing considerations such as 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.' Rule 403, W.R.E."

We give considerable deference to the trial court's evidentiary rulings and will not disturb them unless the court has clearly abused its discretion. The trial court was justified in refusing to admit into evidence the arrest record of the victim. The arrest history had slight relevance. We do not doubt that the danger of prejudice and confusion outweighed the probative value of the arrest record.

V

In his final argument appellant claims that there was insufficient evidence to convict him of second degree murder.

Appellant was convicted under § 6-2-104, W.S.1977, (1983 Replacement), which provides:

"Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree * * *."

He contends that the state failed to prove malice.

" * * * [T]he duty of this court is to examine all the evidence in the light most favorable to the state to determine if there is sufficient evidence to uphold the verdict." *Cheatham v. State,* Wyo., 719 P.2d 612, 624 (1986).

See also, *Cutbirth v. State,* Wyo., 663 P.2d 888 (1983).

 Malice has been defined as intentional killing without legal justification or excuse and under circumstances which are insufficient to reduce the crime to manslaughter. *Nunez v. State,* Wyo., 383 P.2d 726 (1963). If the facts and circumstances allow, then malice may be inferred by the use of a deadly weapon. *Kennedy v. State,* Wyo., 422 P.2d 88 (1967).

 In this case, appellant walked into his apartment and loaded his rifle with three bullets selected from a box of shells. After coming out of the apartment, he fired one shot in the air. He then pointed the rifle at the victim and fired the second shot about fourteen seconds after the first. The wound was horizontal. He then put the third bullet in the chamber and walked

to the dying victim and pointed the rifle at his head.

By appellant's own testimony the victim was not making any menacing gestures when he was shot. The rifle had an ordinary trigger pull and worked normally. Additionally, after he shot the victim he told his wife that they had to get their stories straight.

In *Cutbirth v. State,* supra, appellant was convicted of second degree murder. He contended, as is alleged in the case before us, that the evidence was insufficient to show malice. Further, the facts in the *Cutbirth* case showing malice are similar to the facts in this case.

In *Cutbirth* we said:

"There were significant facts from which the jury could find that appellant maliciously intended to use the revolver against his wife. Appellant pointed the gun toward his wife before its discharge. The gun was discharged within 2 feet of the victim's forehead, and the bullet entered the victim's skull almost between the eyes. The death weapon was a .357 magnum revolver with normal trigger pull and no malfunction. After the shooting appellant threw the gun outside." Id. at 889, 890.

" * * * [T]he malice of which the crime speaks may be inferred from the use of a deadly weapon in a deadly manner, if the facts and circumstances will permit. * * Malice may be inferred from all of the other facts and circumstances. * * * " *Leitel v. State,* Wyo., 579 P.2d 421, 424 (1978).

In *Smith v. State,* supra, at 1198, we said:

"Purposely denotes intent. Use of a deadly weapon gives rise to a presumption of intent to kill. * * * The design to kill is inferred from the act of killing. * * * Malice may be inferred from the use of a deadly weapon in a dangerous and deadly manner if the facts and circumstances so allow. * * * "

Therefore, we hold that there was sufficient evidence from which the jury could find beyond a reasonable doubt that appellant killed Danny Gregorio purposely and with malice. The evidence favorable to the state as it pertains to second degree murder, together with favorable inferences which may be reasonably and fairly drawn, is inconsistent with involuntary manslaughter.

We have carefully considered the five issues raised by appellant and find that there was no reversible error.

Affirmed.

URBIGKIT, J., filed a dissenting opinion.

URBIGKIT, Justice, dissenting.

Differing from the court's resolution of Issue II (jury prejudice), and dissenting from disposition of Issues I and IV (admissibility of defendant's evidence), I also dissent to the decision on the sufficiency-of-the-evidence contention of Issue V. To be considered is not only the treatment of these issues in this case, but far more importantly what appears on some issues as an unfortunate development of two disparate standards, depending on whether favoring the defendant or the prosecution. Knowing this court would not consciously develop one standard used to convict and another singularly different to acquit, I respectfully address the emerging double standard.

## ISSUE II: ERROR TO LIMIT THE EXTENT OF DEFENSE INVESTIGATION INTO THE ALLEGED JURY TAMPERING

After a claim of a fixed jury arose at trial, defendant attempted to probe the jury status to establish or disprove those allegations. The trial court confined defense counsel's examination to events occurring during trial and before commencement of deliberations, in denying inquiry which could reach the substance of the corroborating information furnished in interview by the jury foreman. The trial court decision now supported by this court is based on a misconception that Rule 606(b), W.R.E., exists as a complete barrier to all inquiries which open to view jury prejudice beyond the deliberation session as specifi-

cally excluded from examination. I disagree in that Rule 606(b) allows an exception—where the inquiry proceeds from a substantial allegation that a juror lied during voir dire. After stating:

"* * * Where the comments indicate that the juror had preconceived notions of liability or guilt or personal knowledge about the facts in issue, the statements may be admissible not because they are not prohibited by Rule 606(b), but as tending to prove that the juror lied on the voir dire * * *." 3 Weinstein, § 606[04], p. 606–33 (1985),

Weinstein further states:

"Wigmore would prohibit all disclosure—except where the proof is offered in connection with a showing that the juror had lied on the voir dire in failing to indicate bias * * *." Id. at 606–34.

The problem considered here arose during the course of the trial when a person anonymously, but later identified as Michael Evans, called the office of the Public Defender about prejudicial influence of decedent's family with two jurors, including one who was his grandmother.

My examination of the record does not accord with the conclusion of this court that:

"The only restriction placed on appellant in his questioning of witnesses at the hearing on a motion for new trial were strictures specifically provided for in Rule 606(b), W.R.E. Otherwise, he was given wide latitude."

Rule 606(b) only justifies examination denial of occurrence during deliberations, and clearly affords no restriction on retesting accuracy of initial voir-dire answers.

"* * * Moreover, where comments indicate prejudice or preconceived notions of guilt, statements may be admissible not under F.R.E. 606(b) but *because they may prove that a juror lied during the voir dire.* * * * Such evidence can be used to show that a juror should be disqualified by his prejudice and that the verdict in which he participated was a nullity." (Emphasis added.) *Tobias v. Smith,* 468 F.Supp. 1287, 1290 (W.D.N.Y. 1979).

The actual restriction was circumscribed by the trial court at the commencement of the new-trial motion hearing:

"THE COURT: Very well. You say you understand the guidelines. It's my understanding—and so we all have the same understanding—that all we're concerned about is to ask jurors whether or not, after they were chosen and selected in this case, whether they had any outside contact with anyone prior to reaching their verdict, and not about their deliberations or what they thought of or talked about or felt during their deliberations."

The premise for confinement of examination of the jurors to events occurring during trial is not established by this record. Obviously if the decedent's family, and particularly the father, had "influence" with the two jurors, the basis would predate trial commencement and would have existed when the initial voir-dire examination occurred, as evidenced in questioning Juror K as one of the two named by the informant:

"MR. CARROLL [Prosecuting Attorney]: Mrs. K, do you know anything about this case except what you have heard here in the courtroom?

"MS. K: Just what I have heard in the courtroom. * * *.

"MR. CARROLL: And is there anything that you want to tell any of us that would have a bearing on your ability to serve as a fair and impartial juror in this case?

"MS. K: No.

* * * * * *

"MS. K: No, I just recognize the victim's brother sitting over there. I just know who he is through a friend.

"MR. CARROLL: You say you recognize him?

"MS. K: Yeah, I just know him through someone as an acquaintance, a casual one.

"MR. CARROLL: Have you had any social or business relationship with him?

"MS. K: No, I just know who he is,"

and similar inquiry of informant's grandmother, Juror G:

"MR. CARROLL: * * * And, Mrs. G, do you know anything about this case except what you have heard here in the courtroom?

"MS. G: No.

\*　　\*　　\*　　\*　　\*　　\*

"MS. G: No, I have seen the father but—I don't know him personally.

"MR. CARROLL: Do you know Mr. Gregorio, you have seen him?

"MS. G: I have seen him but I don't know him personally.

\*　　\*　　\*　　\*　　\*　　\*

"MR. CARROLL: And is there anything I should have asked you that I have not that would bear on your ability to serve as a fair and impartial juror?

"MS. G: No, I don't think so."

Again, we are faced with the age-old dilemma of being ignorant as judges of what we know as persons: (1) a juror's grandson anonymously called the Public Defender twice with contention of a fixed jury; (2) after trial, counsel for defendant interviewed the foreman of the jury, obtaining conjecturally corroborating information; and (3) pure coincidence without causative rationale is an anathema to the laws of nature.

I would not confine inquiry of the defense merely to the scope permitted by the trial court, particularly so since limitation is not justified by the test of Rule 606(b), W.R.E. Exclusion of the substance of deliberations after the jury started verbal consideration is considerably more confined than was the examination preclusion actually effected. Particularly of concern, although not clearly defined in this record, is the afforded opportunity for further examination post-trial, to determine whether initial voir dire was intentionally or unintentionally false.

Additionally, I see little justification for denying the court's consideration of the testimony of the foreman of the jury about the substance of the information which he had furnished to counsel for defendant in post-trial interview in order to determine the initial fairness and reliability of the two women jurors and the accuracy of the answers given on initial voir dire. I find a difference between an initial determinative posture and later positions and discussion adopted during the deliberative session.[1]

Furthermore, a curious dichotomy is formulated by this opinion. The court would describe Evans as unworthy of belief as "a convicted felon." Because prosecutors often embrace convicted felons as reliable witnesses, "the jury is entitled to know that the state's witnesses are convicted felons," *State v. Ross*, 104 N.M. 23, 715 P.2d 471, 475 (1986), I find greater significance in Evans being the grandson of one of the two subject jurors as logical support for possible knowledge.

Necessary to the court's thinking is the conception that a person's past criminal status always serves to predict the value of that person's continuing actions. Oddly enough, this notion is then abandoned completely in Issue IV where this court approves the exclusion of the decedent's past arrest record when offered by the defendant to prove pertinent traits of the victim.

If the status of being a convicted felon deters believability, the officers of the Wyoming Bar Association must be hard-pressed to explain successfully the reported $5,000 price tag in inviting the ex-convict, G. Gordon Liddy, to speak at its annual convention.

Recognizing that we are not intruding within the strictures of Rule 606(b), but only in the general area of the exercise of discretion, the "guidelines" were, in my interest-of-justice analysis, far too confined.

1. I do not perceive the current United States Supreme Court opinion in *Tanner v. United States*, —— U.S. ——, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), a five-to-four decision, to be inapposite for Wyoming Constitutional inquiry, first because I find the dissent to state a more rational and well-reasoned position, and second, what is tested is not deliberative activities but incontinent if not deliberately false response to voir-dire examination.

Because I would reverse and remand for retrial on the basis of the remaining issues and so would not anticipate this particular problem to arise again with a fresh jury, my dissent on this issue will not be expanded, except to note that in jury tampering cases, the inquiry, where the allegations prove to be true, "does not end there, however, because not every incident of juror misconduct or bias requires a new trial." *United States v. Hendrix*, 549 F.2d 1225, 1229, cert. denied 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74, reh. denied 434 U.S. 960, 98 S.Ct. 493, 54 L.Ed.2d 321 (1977). But "[i]f only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." Id. at 1227.

## ISSUE IV: INSUFFICIENCY OF EVIDENCE FOR SECOND–DEGREE MURDER CONVICTION

The majority affirm that the evidence justified the second-degree murder conviction. After allowing for the fact that the jury was denied knowledge of the victim's past arrest record (Issue IV), and that they were denied the defendant's expert witness' testimony of the effect fear might have in impairing judgment (Issue I), I could agree based only on the testimony given. But the information permitted to be introduced was not all the specifics which should have been available to the jury. My dissent unfolds from the assertion that the evidence was insufficient because proper evidence was excluded, not that the information as it was before the jury was insufficient for a second-degree murder conviction.

In the present opinion this court says: "Malice has been defined as intentional killing without legal justification or excuse and under circumstances which are insufficient to reduce the crime to manslaughter."

Necessarily, a full examination by the trial court should always be made which fairly allows a determination whether or not the circumstances *are* insufficient to reduce the crime to manslaughter. Under § 6–2–105(a)(i), W.S.1977, a person is guilty of voluntary manslaughter if he or she unlawfully kills any human being without malice, express or implied, voluntarily, upon a sudden heat of passion. To infer malice then is to assert that there are no circumstances which would allow an inference of voluntary manslaughter, i.e., no sudden heat of passion.

The majority say, "In this case, appellant walked into his apartment and loaded his rifle * * *." From the facts developed at trial, one might well say, "In this case, appellant rushed into his apartment to call the police and upon hearing his wife's screams, loaded his rifle." While heat of passion is often brought to mind as the kind of emotion a husband might experience in suddenly finding that his wife has an additional lover, *State v. Saxon*, 87 Conn. 5, 86 A. 590, 594 (1913), I submit that sudden heat of passion would grip any man or woman who suddenly hears a blood-chilling scream from a loved one, knowing he or she is in a potentially very dangerous confrontation with a trouble-provoking and antagonistic individual.

"[T]he legal definition of heat of passion should incorporate the reactive passions of fear and terror as fully as it includes the aggressive passion of rage in order to recognize a close relationship between heat-of-passion manslaughter and imperfect self-defense." Comment, *Provoked Reason in Men and Women: Heat-of-Passion Manslaughter and Imperfect Self-Defense*, 33 U.C.L.A. L.Rev. 1679, 1682 (1986).

This court, while properly disapproving the concept of diminished capacity as an infringement on the legislature, *Dean v. State*, Wyo., 668 P.2d 639, 644 (1983), has never authoritatively[2] discussed the defense of imperfect self-defense when linked to heat-of-passion manslaughter. However, this court came close in discussing the psychological factors faced by a long-

---

2. See, however, *Best v. State*, Wyo., 736 P.2d 739 (1987), which discussion this writer did not then and does not here consider to be precedentially dispositive of the broad principles not there factually invoked.

battered youth who killed his father. *Jahnke v. State*, Wyo., 682 P.2d 991, 1013 (1984).

The legislature set the parameters of defense for mental illness or deficiency in § 7–11–304, W.S.1977. To allow any defendant to argue diminished capacity outside the conceptual limits of § 7–11–304 would necessitate a violation of the constitutional demand for separation of powers. Art. 2, § 1, Wyoming Constitution. This is not the case which would obtain in allowing the development of an imperfect self-defense, since the legislature has not codified self-defense, and this court allows self-defense as unobtrusive upon the legislature's province. *Mewes v. State*, Wyo., 517 P.2d 487, 488 (1973). An imperfect self-defense lies within the radius of self-defense, as in this case where the defendant came to the help of his wife, on "asserting the justification of defense of another," stepped into the position of the person defended. *Leeper v. State*, Wyo., 589 P.2d 379, 383 (1979).

Perfect self-defense is defined by Illinois in *People v. Brown*, 104 Ill.App.3d 1110, 60 Ill.Dec. 843, 847, 433 N.E.2d 1081, 1085 (1982), as follows:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend * * *." Ill.Ann.Stat.1977, Ch. 38, § 7–1.

and imperfect self-defense:

> "A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing * * * but his belief is unreasonable." Ill.Ann.Stat. Ch. 38, § 9–2(b).

See also *Lambert v. State*, 70 Md.App. 83, 519 A.2d 1340, 1346, cert. denied 309 Md. 605, 525 A.2d 1075 (1987). The notion of an imperfect self-defense is that the actor honestly but unreasonably took the steps he took.

> "The concept of reasonableness is as firmly entrenched in the law of self-defense as it is in the law of heat-of-passion

manslaughter." 33 U.C.L.A. L.Rev., supra at 1700.

Since this court says:

> "'* * * Malice may be inferred from all of the other facts and circumstances,'" quoting from *Leitel v. State*, Wyo., 579 P.2d 421, 424 (1978),

it would seem strange if malice may be inferred from all the circumstances, but heat of passion cannot. Yet, when the defendant is denied the opportunity to develop fully all the circumstances from which heat of passion arising from terror or fear could be inferred, he is denied the opportunity to preclude an inference of malice. Where he has not been given that opportunity, the whole story is kept from the jury and, in that sense, the whole evidence might be insufficient to convict for murder in the second degree. I am not unaware of the restrictive posture as defensively applied in enunciation by this court in *Buhrle v. State*, Wyo., 627 P.2d 1374 (1981), and at least peripherally continued in *Krucheck v. State*, Wyo., 702 P.2d 1267 (1985). Unless this court is adopting a standard that what is not admissible for defense is admissible for prosecution, these two cases in restrictive structure cannot be accommodated to much of the current literature in comparable cases, but more specifically, even after ignoring the vouching-for-the-truthfulness aspect, to what this court now stated in *Brown v. State*, supra. Buhrle is today in the obvious minority. See Note, *A Trend Emerges: A State Survey on the Admissibility of Expert Testimony Concerning the Battered Woman Syndrome*, 25 J.Fam.L. 373 (1986). At the time of writing, the author found only three other states in concurrence, Louisiana, Ohio and Texas, compared to seven where unconditionally admissible, and six where conditionally admissible. 33 U.C.L.A. L.Rev., supra; Rosen, *The Excuse of Self-Defense: Correcting a Historical Accident On Behalf of Battered Women Who Kill*, 36 Am.U.L.Rev. 11 (1986). To be noted is that the Dyas test, *Dyas v. United States*, D.C.App., 376 A.2d 827, cert. denied 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977), adopted in Buhrle is more restrictive than the liberal-

ized test of Rule 702 in our Rules of Evidence. Compare as considered on another basis, *State v. Zespy*, Wyo., 723 P.2d 564 (1986).

> " * * * Thus, the more liberal Rule 702 requires only that the expert's scientific, technical or other specialized knowledge assist the trier of fact; there is no requirement that expert testimony be beyond the understanding of the jury." 25 J.Fam.L., supra at 374.

## ISSUE I: ERROR TO EXCLUDE DR. MERRELL'S TESTIMONY AS TO THE STATE OF MIND OF THE DEFENDANT

It is a "well-settled rule of law that the expert witness may not testify to the truthfulness of the victim." *Brown v. State*, Wyo., 736 P.2d 1110, 1125 (1987), Urbigkit, J., dissenting, citing *United States v. Azure*, 801 F.2d 336 (8th Cir.1986). Equally, an expert " 'cannot testify as to the truthfulness of the defendant's version [of the incident].' " *Brown v. State*, supra at 1115, quoting from *Smith v. State*, Wyo., 564 P.2d 1194, 1200 (1977).

This defendant wanted to introduce expert testimony, not that the expert thought he was telling the truth which would invade the province of the jury, but that "fear can certainly impair judgment." It seems inadequate simply to announce, "We hold that fear and stress are emotions experienced by all mankind and are not distinctively related to some science." While fear and stress are emotions experienced by all of us, we do not all react equally to the same stimulus, in the same way or in the same fashion. Of particular interest in understanding the psychology of conflict as augmented by the introduction of firearms, is the work in 29 Law & Contemp.Probs. (1986), and particularly Stell, *Close Encounters of the Lethal Kind: The Use of Deadly Force in Self-Defense*, 29 Law & Contemp.Probs. 114 (1986). Unfortunately the 249–page treatise does not consider adequately the intrinsic-proclivity factor of availability motivation, particularly when infected by ingestion of alcohol.

When an expert can place weight upon a particular stimulus or the action or reaction results of the stimuli, then the expert should "aid the trier in his search for truth." This would allow the defendant the opportunity to develop an imperfect self-defense—that he honestly believed the actions he took were necessary even though assessable in hindsight as unreasonable. In the nature of psychological reaction, threat to wife or children might frequently cause more reaction than would threat to one's self. Protective love in many is a more pervasive stimulus than personal safety. To ignore that mental quality is to reject human history and deny well-established fact.

As judges, we should not ignore what we know both as lawyers and as people, in denying expert analysis of the effect of stress-factor sensors causatively related to the malice differentiation between murder and manslaughter.[3]

When a reaction is deemed self-defense, the reaction is said justified; when the reaction is heat of passion, the reaction is said partially excused. Respected thinkers have devoted exhaustive consideration to their analyses of human understanding to justification versus excuse; the significance of justification; defense of justification; reasonable-men criteria; passion and emotion as dethroning reason; self-defense re-examined; the adequacy of provocation; interpretative construction; and imperfect self-defense. What is discerned through synonym versus antonym; similarity and differentiation; desert and detriment; and rule and standard, is that the relationship of intended result to assessed retribution is both clouded in fact and confused in conception. If scholars so disagree, how can the trial process, on the basis that we all experience fear and stress, reject expert assistance on the totality of causation and character while seeking justice? Levenbook, *Responsibility and the Normative Order Assumption*, 49 Law Contemp.

---

**3.** As Justice Frankfurter also said, an " 'issue of fact' is a coat of many colors." *Watts v. Indiana*, 338 U.S. 49, 51, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949).

Probs. (1986); McEwen, *The Defense of Justification and Its Use by the Protestor: A Focus on Pennsylvania,* 91 Dick.L.Rev. 1 (1986); Morawetz, *Reconstructing the Criminal Defenses: The Significance of Justification,* 77 J.Crim.Law and Criminology 277 (1986); Donovan and Wildman, *Is the Reasonable Man obsolete? A Critical Perspective on Self-Defense and Provocation,* 14 Loy.L.A.L.Rev. 435 (1981); Perkins, *Self-Defense Re-Examined,* 1 U.C.L. A.L.Rev. 133 (1953); Dressler, *Rethinking Heat of Passion: A Defense in Search of a Rationale,* 73 J.Crim.Law and Criminality 421 (1982); Kelman, *Interpretive Construction in the Substantive Criminal Law,* 33 Stan.L.Rev. 591 (1981); Note, *Manslaughter and the Adequacy of Provocation: The Reasonableness of the Reasonable Man,* 106 U.Pa.L.Rev. 1021 (1958); Dressler, *New Thoughts About the Concept of Justification in the Criminal Law: A Critique of Fletcher's Thinking and Rethinking,* 32 U.C.L.A.L.Rev. 61 (1984); Fletcher, *The Individualization of Excusing Conditions,* 47 S.Cal.L.Rev. 1269 (1974); Note, *Partially Determined Imperfect Self-Defense: The Battered Wife Kills and Tells Why,* 34 Stan.L.Rev. 615 (1982).

The engine of this dissent is driven by the treatment given this expert's testimony when contrasted to the treatment given the complaining expert witness in *Brown v. State,* supra. In Brown, expert testimony was allowed to help convict. Here, expert testimony to challenge for acquittal is denied.

In *Brown v. State,* supra, the expert testimony was that the complaining witness took a psychological "test" which "showed" she had been sexually abused and was truthful. One struggles to capture the logic necessary to reveal how this is not expert testimony vouching for the truthfulness of the complaining witness, except that the court said that *Smith v. State,* supra, 564 P.2d at 1200 stood for the notion that an expert "cannot testify as to the truthfulness of the defendant's version [of the incident]" and that principle was not violated. To allow expert testimony which infringes on the province of the jury when

that testimony is used to convict, and to disallow expert testimony which might develop an imperfect self-defense when that testimony is used to help acquit, points to an inconsistent treatment by this court which is constitutionally (due process) and logically (fairness) unacceptable.

## ISSUE IV: ERROR TO EXCLUDE THE PAST ARREST HISTORY OF THE VICTIM

This defendant sought to pursue the Rule 404(a)(2), W.R.E., exception—pertinent trait of the decedent—by introducing his past arrest history to place a perspective on defendant's reaction in the context of his perception of a threat to his wife. As Rule 404(a)(2) specifically allows evidence of a pertinent trait of the victim, the question arises whether evidence of other crimes, wrongs, or acts may be used to establish for the jury in this case that pertinent trait. The plain language in Rule 404(b), W.R.E. reveals no barrier in applying Rule 404(b) to the decedent as well as the defendant when arguing pertinent trait. Several courts take this approach.

In *United States v. Greschner,* 647 F.2d 740, 742 (7th Cir.1981), the Seventh Circuit Court of Appeals reversed a lower court for excluding proof of the victim's "violent character" by application of Rule 404, F.R.E., which creates a specific exception to offer evidence of a pertinent character trait. As in that case approved, it is in this case precisely what the defendant attempted. In articulating the reasoning, that court said:

"* * * The reason that prior convictions are disfavored, however, is *not* that they are irrelevant, but that they may be extremely prejudicial. In the instant case, there was no issue of prejudice since [the victim] was neither a defendant nor a witness." 647 F.2d at 742, n. 1,

with which the Virginia courts agree:

"It is well settled in Virginia that where an accused adduces evidence that he acted in self-defense, evidence of specific acts is admissible to show the character of the victim for turbulence and violence,

even if the accused is unaware of such character." *Jordan v. Commonwealth*, 219 Va. 852, 252 S.E.2d 323, 325 (1979). See also *State v. Basque*, 66 Hawaii 510, 666 P.2d 599, 602 (1983):

" * * * [W]e treated general character evidence and specific prior acts (including those reflected in the victim's criminal record) the same for purposes of corroborating a defendant's self-defense claim as to who was the aggressor."

The reasoning concludes:

" ' * * * [P]roof of the deceased's violent and turbulent character in this situation is circumstantial evidence of the likelihood of his being the aggressor.' " Id. 666 P.2d at 602, quoting from *State v. Lui*, 61 Hawaii 328, 603 P.2d 151, 154 (1979).

The orbit of the majority's analysis fails to encompass the defendant's argument. The defendant wished to introduce, during trial, evidence of a *pertinent trait* of the victim by introducing the victim's past arrest history. The majority discusses how Rule 404(b) is quite often used subversively by both prosecutors and defendants against victims to establish that the person acted in conformity with his or her character. I agree fully that in the absence of an offer to prove pertinent trait, it is indeed a subversion of Rule 404(a) to use adverse character evidence for substantive-fact evidence. This subversion is seen most clearly when a Rule 404(b) exception is allowed to eclipse Rule 404(a). It is precisely this subversion I argued against where motive eclipsed propensity, *Brown v. State*, supra, when no mention of pertinent trait was made and yet this court willingly allowed propensity evidence, thinly veiled as motive, where that evidence was used to convict. This defendant attempted to demonstrate pertinent trait and was inappropriately denied that opportunity on the basis of a need to prevent Rule 404(b) abuse. While Rule 404(a)(2) is subject to a Rule 403, W.R.E. prejudice balancing, Rule 404(b) cannot fairly stand as a barrier to Rule 404(a)(2).

Apprehended is that evidence of *alleged* past sexual abuse with someone other than the victim is admitted to help convict, *Brown v. State*, supra, despite the enormous presence of prejudice, but evidence of an arrest *record* of the deceased is excluded on the basis of possible prejudice. One cannot help but be confronted by a strange vacuum when an attempt is made to articulate the logic necessary to accommodate such different results.

The court makes note that the victim's arrest record began at age 13. Presumably, such an alert is tangential to the issue of remoteness. A pertinent trait not extended through time cannot reliably be called a trait. The question then for this court is, at what point does the pertinent trait become acknowledged as pertinent but yet not remote? Remoteness may have little force on an argument concerning pertinent trait. Where it does have some force, the analysis necessary to give that force some place in the argument must be more rigorous than this court has provided.

The majority also ascribe that only one arrest concerned violence, which occurred at a police booking desk, before defining the exclusion of the past arrest record to have been proper. Occasioned by a set of circumstances not dissimilar to this case, a defendant arguing self-defense sought to introduce a prior conviction of the victim for assault and battery upon a police officer. The Pennsylvania Supreme Court, in dismissing the argument of the prosecution, said:

"The prosecution argues that punching a police officer in a police station presents a 'less serious' and entirely different situation than the one at issue here. When the prior conviction is for assault and battery, there is no need to compare the facts. Any difference is irrelevant. A conviction for assault and battery necessarily implies a character involving aggressive propensities." *Commonwealth v. Beck*, 485 Pa. 475, 402 A.2d 1371, 1373 (1979).

Our court concedes:

"Arguably, the bits and pieces of the record *might* support appellant's theory

that the victim was the aggressor." (Emphasis added.)

Yes, they might. That is the point in issue. Nothing in the Braley story disproves an aggressive characterization of decedent.

In *United States v. Greschner*, supra, 647 F.2d at 741, the court said:

" * * * [T]he 'violent character' line of proof is relevant to the defendant's theory of self-defense in that it makes his version that the victim attacked him 'more probable.' "

For this defendant, the offered and refused character evidence of the decedent was equally relevant.

Given the predictive value granted to Michael Evans' status as a criminal during appellant's jury-tampering issue, why then is the criminal record of decedent of 13 offenses, whether or not matured by act or accident to the level of a felony, not singularly significant? Specifically, we would find included in 1973, shoplifting; 1976, disturbance of property, removing tires from a car; 1977, failure to appear for a traffic citation; 1977, disturbance, yelling and cussing, refused to leave property on request by owner; 1978, drinking and driving, "extremely belligerent and threatening," obscene language, made threats against the family of arresting officer; 1978, disturbance and destruction of property, made threats against officer, attempted physical assault on officer at booking, including kicking and use of obscene language; 1979, drinking and driving; 1980, car prowl; 1980, open container in automobile; 1981, drinking and driving; 1983, drinking and driving; and 1984, drinking and driving, uncooperative. Then, in 1985, this event occurred which involved drinking, driving, parking and the disturbance. Unfortunately, it was final.[4]

The course of events at the scene, detailed to have lasted nearly an hour, gives no pause for the characterization of heroism by any of the participants. The recognition of the friend of the decedent that "[when the Braleys return] we're going to get into a fight," gives some substance to conjecture that the parking place chosen after the first incident was deliberately arranged with a fair likelihood of provocation.

While "the admission of evidence is within the sound discretion of the trial court and absent a clear abuse of discretion will not be disturbed," *Taylor v. State*, Wyo., 642 P.2d 1294, 1295 (1982), and "[t]hat party must establish that the ruling of the trial court was erroneous and that it did affect substantial rights of the party," *Jahnke v. State*, supra, 682 P.2d at 1005, when facing the same problem, the federal court in *United States v. Greschner*, supra, has said

" * * * The trial court's improper exclusion of the character and motive evidence was seriously prejudicial to that theory. Therefore, the improper evidentiary rulings require reversal of the defendant's assault conviction and a new trial." 647 F.2d at 743.

I cannot conclude that due process and fairness as constitutionally and procedurally required to avoid unapprovable trial prejudice to defendant will be found or does exist from denial to the jury of the complete story from the victim's past arrest record and evidence of rejection of defendant's expert-witness testimony. Viewing this trial-evidence denial as an improvident abuse of discretion, I would reverse the conviction and remand for retrial.

---

4. The court's opinion speaks of "victim," and this dissent of "decedent." Unfortunately, the victims in these assault fatality cases are many, including wives, families, society, and, not insignificantly, the Wyoming taxpayer.